88 P.3d 647

In the Matter of INTERNATIONAL BROTHERHOOD OF PAINTERS AND ALLIED TRADES, DRYWALL TAPERS, FINISHERS & ALLIED WORKERS LOCAL UNION 1944, AFL–CIO; International Brotherhood of Painters and Allied Trades, Painters Union Local 1791, AFL–CIO; Joint Apprenticeship Committee for the Hawaii Taping Industry; and Joint Apprenticeship & Training Committee for the Painting Industry of Hawaii, Appellants–Appellees

v.

Nelson B. BEFITEL,[1] Director, Department of Labor and Industrial Relations; State of Hawai'I, Department of Labor and Industrial Relations, Appellees–Appellants

and

United Brotherhood of Carpenters and Joiners of America, Local 745, AFL–CIO, Intervenor–Appellee.

No. 23880.

Supreme Court of Hawai'i.

April 30, 2004.

Reconsideration Denied June 1, 2004.

---

1. Pursuant to Hawai'i Rules of Appellate Procedure Rule 43(c)(1), Nelson B. Befitel, the current Director of the Department of Labor, has been substituted for Lorraine Akiba, the Director at the time this case was decided by the first circuit court.

Frances E.H. Lum, Deputy Attorney General, State of Hawai'i, Labor Division, on the briefs, for appellees-appellants.

Herbert R. Takahashi, Rebecca L. Covert, Honolulu, of Takahashi, Masui & Vasconcellos, on the briefs, for appellants-appellees.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY JJ.

Opinion of the Court by ACOBA, J.

We hold that a contested case hearing pursuant to Hawai'i Revised Statutes (HRS) § 91–14(a) (1993) was not required in the determination by Appellee-appellant Director (Director) of the Appellee-appellant Department of Labor and Industrial Relations (DLIR) (collectively Appellees) to register an apprenticeship program pursuant to HRS § 372–4 (1993). Ultimately, we conclude that none of Appellants–Appellees International Brotherhood of Painters and Allied Trades, Drywall Tapers, Finishers & Allied Workers Local Union 1944, AFL–CIO (Local 1944); International Brotherhood of Painters and Allied Trades, Painters Union Local 1791, AFL–CIO (Local 1791); Joint Apprenticeship Committee for the Hawai'i Taping Industry (Taping Apprenticeship Committee); and Joint Apprenticeship & Training Committee for the Painting Industry of Hawai'i (Painting Apprenticeship Committee)

(collectively, Appellants), purportedly acting on behalf of certain tapers and painter apprentices, was deprived of any identifiable property interest by the registration of an apprenticeship program initiated by the United Brotherhood of Carpenters and Joiners of America, Local 745, AFL–CIO (the Carpenters) so as to invoke due process protections by way of a contested case hearing.

Therefore, the October 11, 2000 findings of fact (findings) and conclusions of law (conclusions) and order of the first circuit court (the court)[2] which were to the contrary and resulted in the vacation of the DLIR's decision are vacated, for the reasons set forth below. The case is remanded with instructions to the court to enter an order granting the DLIR's June 16, 1999 motion to dismiss Appellants' notice of appeal.

## I.

On or about February 13, 1998, the Carpenters filed an application with the Director and DLIR for the registration of the Carpenters' tapers and painters apprenticeship program (Carpenters' apprenticeship program) pursuant to HRS chapter 372. That chapter governs the administration of such programs for trades and crafts. Participation in the apprenticeship program is voluntary. HRS § 372–1. The Director is empowered to (1) "[e]stablish standards for apprenticeship

agreements in conformity with this chapter . . . [and] (4)[r]egister such apprenticeship agreements as are in the best interest of apprenticeship and which conform to the standards established by this chapter." HRS § 372–5(1) & (4) (1993). An apprenticeship agreement is "a written agreement which conforms to standards established under this chapter and is entered into between an apprentice and (1) an employer, (2) an association of employers, (3) an organization of employees, or (4) a joint committee representing employers and employees." HRS § 372–2 (1993).

HRS § 372–3 sets forth standards for the agreements, *see infra* note 18. Under authority of HRS § 372–4, the Director may establish "a committee to be known as the apprenticeship council which shall sit in an *advisory* capacity to the director on matters within the jurisdiction of the department relating to apprenticeship programs." (Emphasis added.)

The Director referred the Carpenters' application to the State Apprenticeship Council (SAC), the committee established under HRS § 372–4.[3] On June 2, 1998, at a meeting held in accordance with the public meeting requirements of HRS chapter 92,[4] Local 1944,[5] Local 1791,[6] Taping Apprenticeship Committee,[7] and Painting Apprenticeship

---

**2.** The Honorable Sabrina S. McKenna presided.

**3.** HRS § 372–4 (1993) states

> The director of labor and industrial relations may establish within the department of labor and industrial relations a committee to be known as the apprenticeship council *which shall sit in an advisory capacity to the director on matters within the jurisdiction of the department relating to apprenticeship programs.* The membership and organization of the council shall be determined by the director. The members of the council shall be appointed and removed at the pleasure of the director. The director or the director's subordinate officer in charge of the apprenticeship program shall act as secretary of the council. (Emphasis added.)

**4.** Chapter 92 pertains to public agency meetings and records.

**5.** Local 1944 is a labor organization which represented approximately 280 apprentice and journeyman tapers in the state, and operates a duly registered training and apprenticeship program

for tapers employed in the construction industry under HRS chapter 372.

**6.** Local 1791 is a labor organization which represented approximately 849 apprentice and journeyman painters in the state and operates a joint training and apprenticeship program for painters employed in the construction industry pursuant to HRS Chapter 372.

**7.** The Taping Apprenticeship Committee

> is a duly authorized 'committee' established under HRS § 372–7 which currently administers and operates a joint training and apprenticeship program for approximately forty nine (49) taper apprentices under a program which has been duly registered by the Department of Labor and Industrial Relations since September 1, 1967 under HRS chapter 372.

According to HRS § 372–7 (1993)

> [l]ocal joint apprenticeship committees may be approved by the director of labor and industrial relations in any trade, group of trades, or in trade areas, whenever the apprentice training

278

Committee [8] voiced their opposition to the application. The SAC voted unanimously "to disapprove the carpenters union application."

On July 17, 1998, the Director met with a representative of the Carpenters' and received additional information in support of the application. The SAC met again on February 9, 1999 to review the information given to the Director. The SAC "tabled the matter" and requested that the DLIR do an independent review.

On March 16, 1999 the SAC reconvened to hear the results of the independent review. The information requested by the SAC at the February 9, 1999 meeting regarding licensing and qualification issues was discussed. The report stated in part that "information from the [Department of Commerce and Consumer Affairs] 'showed that none of the employers signatory to the carpenters union proposal had specialty contractors licenses in painting and taping.'" Based on this information, the SAC "voted unanimously to make a recommendation to the Director that the program *not be approved* based on it being equal to or better than' the existing programs." (Internal quotation marks omitted.) (Emphasis in original.)

However, Elaine Young, the secretary to the SAC [9] submitted a written recommendation to the Director in favor of approval of the proposal. Young explained in the memorandum that it has been "past practice to determine whether the program proposal,[10] rather than the program per se, is in compliance with [twenty six] standards [outlined in Hawai'i Administrative Rules (HAR) Rule 12–30–6]." [11] Young explained that "[o]nce the program has been approved and established, but prior to the recruitment and/or registration of apprentices, WDD [12] conducts a review of the program to ensure its compliance with the standards." Finally, Young indicated that "[a]lthough contractors and journeyworkers licensing requirements are not under the jurisdiction of DLIR, WDD staff would ascertain whether the program was in compliance with these laws *before allowing the registration of apprentices.*" (Emphasis added.)

On April 29, 1999, the Director approved registration of the Carpenters' program. After the decision, on May 24, 1999, Appellants requested a contested case hearing pursuant to HRS chapter 91 in connection with the said registration. On June 4, 1999, the Director denied the request.

needs of the trade or group of trades justifies the establishment of the committees. The joint apprenticeship committees shall be composed of equal number of persons known to represent the interest of employers and employees, respectively. *Subject to the review of the director* and in accordance with the standards established by this chapter and by the director, the committees shall devise standards for apprenticeship agreements and give assistance to the operation and further development of apprenticeship in their respective trade localities. (Emphasis added.)

8. The Painting Apprenticeship Committee is a duly authorized 'committee' established under HRS § 372–7 which currently administers and operates a joint training and apprenticeship program for approximately two hundred sixty-four (264) painter apprentices under a program which has been duly registered by the Department of Labor and Industrial Relations since September 1, 1961 under HRS chapter 372.

9. According to HRS § 372–4 "the director's subordinate officer in charge of the apprenticeship program shall act as secretary of the council."

10. Following the March 16, 1999 SAC meeting, Young contacted representatives from the carpenters' apprenticeship program for the names of the signatories sponsoring the carpenters' apprenticeship program. She did this pursuant to an e-mail from the Director inquiring whether the law requires "an individual or organization to hold a license in particular trades such as painting or taping in order to lawfully engage in that type of work[.]" In response, Young contacted the Department of Commerce and Consumer Affairs about applicable licensing standards. In a written memorandum to the Director, Young stated "we conclude that a license is required." Young also concluded in her memorandum to the Director that "none of the participating employers currently have the required number of journeyworkers for the number of apprentices they plan to recruit[.]"

11. HAR Rule 12–30–6, for the most part, reiterates with greater specificity the standards set out in HRS § 372–3.

12. It is unclear from record what "WDD" refers to, but there is a workforce development division which is part of the DLIR.

## II.

On May 27, 1999, Appellants filed a notice of appeal with the court, appealing the Director's April 29, 1999 approval of the Carpenters' program. On June 16, 1999, DLIR filed a motion to dismiss Appellants' notice of appeal arguing that the court had jurisdiction only from "a final decision and order in a contested case," pursuant to HRS § 91–14(a). The DLIR maintained that (1) the Director's decision did not result from a contested case, (2) insofar as it related to the registration of apprenticeship programs, HRS chapter 372 did not require a contested case hearing, and (3) the SAC proceedings did not constitute an agency hearing because SAC, which sat only in an advisory capacity, was not an agency within the definition of that term in chapter 91.

On June 28, 1999, Appellants filed a memorandum in opposition to DLIR's motion to dismiss the notice of appeal. Appellants argued (1) departmental rules required a hearing in proceedings to maintain registration standards under chapter 372 and (2) constitutional due process required a hearing to safeguard the rights of apprentices in "parallel" programs. On July 12, 1999, the court filed its order denying DLIR's motion to dismiss notice of appeal, ruling that

13. HRS § 91–14 (1993) states in relevant part that

(a) Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter[.]

14. HRS chapter 372 pertaining to apprenticeships does not contain a provision on appeals.

15. HAR § 12–30–10(c) pertaining to hearings on *cancellation or temporary suspension of apprenticeship agreements* pursuant to HAR § 12–30–8, *and deregistration of apprenticeship programs* pursuant to HAR § 12–30–9 states that "[a]ny person aggrieved by the final decision of the department shall be entitled to judicial review as provided by section 14 of chapter 91, HRS [judicial review of contested cases]." (Emphases added.)

16. HRS § 91–14(g)(1), (2), (3) and (4) (1993) state as follows:

[a]lthough it appears that neither statute nor rules require an agency hearing in the present case, *Constitutional due process protections mandate a contested case hearing in connection with the Director's decision approving the registration* of carpenter's union tapers and painters apprenticeship program.

(Emphasis added.) However, the court did not identify the "due process protections" at issue.

On October 11, 2000 the court filed its findings of fact, conclusions of law and order reversing and vacating DLIR's decision of April 29, 1999. The court, in its conclusion 1 took "subject matter jurisdiction to review ... [the Director's] April 29, 1999 decision approving the registration of the carpenters union ... apprenticeship program pursuant to chapters 91 [13] and 372,[14] HRS, and Department Rule 12–30–10(c)." [15] The court also concluded in conclusion 14 that the

Appellants' substantial rights were prejudiced by the April 29, 1999 decision under § 91–14(g)(1), (2), (3), and (4), HRS,[16] and the carpenters registration approval was 'in excess of authority' in violation of § 372–4, HRS,[17] was 'made upon unlawful procedure' in violation of Constitutional due process, and was 'contrary to statutory

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
(1) In violation of constitutional or statutory provisions; or
(2) In excess of the statutory authority or jurisdiction of the agency; or
(3) Made upon unlawful procedure; or
(4) Affected by other error of law[.]

17. For the text of HRS § 372–4 (1993) entitled "Apprenticeship council," *see supra* note 3.

The court concluded in Conclusion 6 that the Director and the Department
acted in excess of their authority by bypassing the SAC on and after March 16, 1999. Young, who was designated as secretary to the SAC, failed to provide the SAC with relevant and necessary information, and usurped the "advisory" role and capacity of the SAC under § 372–4....

provisions' or 'affected by error or law' in violation of § 372–3, HRS,[18] and Rule 12–5–6(2)(J) and (S).[19]

The court accordingly reversed the Director's April 29, 1999 decision approving registration of the carpenters' apprenticeship program and ordered appellees "not to take further actions attendant to said decision of April 29, 1999 which are inconsistent with the [c]ourt's findings, conclusions, and order as stated herein."

**18.** HRS § 372–3 (1993), entitled "Standards for agreements," states as follows:

"Standards for apprenticeship agreements" are as follows:

(1) A statement of the trade or craft to be taught and the required months or hours for completion of apprenticeship which shall be not less than twelve months or two thousand hours of reasonably continuous employment;

(2) A statement of the processes in the trade or craft divisions in which the apprentice is to be taught and the approximate amount of time to be spent at each process;

(3) A statement of the number of hours to be spent in related instruction which shall not be less than one hundred and forty-four hours per year; provided that the department of labor and industrial relations may, in the best interest of apprenticeship, reduce the hours of related instruction;

(4) A statement that apprentices shall be not less than sixteen years of age;

(5) A statement of the progressively increasing scale of wages to be paid the apprentice;

(6) Provision for a period of probation during which the director of labor and industrial relations shall be directed to terminate an apprenticeship agreement at the request in writing of any party thereto;

(7) Provision that after the probationary period the director may terminate an apprenticeship agreement upon agreement of the parties thereto;

(8) Provision that the services of the department may be utilized for consultation regarding the settlement of differences arising out of the apprenticeship agreement where the differences cannot be adjusted locally or in accordance with the established trade procedure;

(9) Provision to specify the ratio of apprentice to journey worker;

(10) Provision that if an employer is unable to fulfill the employer's obligation under the apprenticeship agreement, the employer may transfer the obligation to another employer;

(11) Such additional standards as may be prescribed in accordance with this chapter.

**19.** Although the court cites to HAR Rule 12–5–6(2)(J) and (S), HAR Rule 12–5–6 has been reserved and is no longer effective. Nowhere in

## III.

■ On appeal from the court's order,[20] DLIR argues that: (1) the court erred in concluding that it had subject matter jurisdiction pursuant to HRS chapter 91 when the agency did not hold a contested case hearing and where none was required;[21] (2) the court erroneously concluded that the Director does not have "exclusive" authority with respect to registration of apprenticeship programs or acted in excess of her authority in approving the application;[22] and (3) the

the record does any party refer to HAR Rule 12–5–6; therefore, we believe this is a typographical error and the court is referring to HAR Rule 12–30–6(2)(J) and (S), referenced numerous times by the parties. HAR Rule 12–30–(6)(2)(J) and (S) state:

An apprenticeship program shall be eligible for registration by the department if it conforms to the following standards:

(2) The program standards contain the equal opportunity pledge prescribed in section 12–31–3(b), Administrative Rules, and when applicable, an affirmative action plan and a selection method in accordance with sections 12–31–4 and 12–31–6, Administrative Rules, and provisions concerning the following:

(J) A provision for the numeric ratio of apprentice to journeyworkers consistent with proper supervision, training, safety, and reasonable continuity of employment, and applicable provisions in collective bargaining agreements, in relation to which it is recommended that a ratio of no more than one apprentice for each journeyworker regularly employed by a participating employer in each apprenticable occupation be established;

(S) Assurance of qualified training, personnel and adequate supervision on the job[.]

**20.** In their reply brief, Appellants argue for the first time on appeal that the court had jurisdiction pursuant to HRS § 632–1 pertaining to declaratory judgments. However the notice of appeal gave no indication that the case was brought pursuant to this statute. Moreover, no request for declaratory judgment was made to the court. Therefore, "this issue is deemed waived for the purposes of this appeal." *Mauna Kea Power Co. v. Bd. of Land and Natural Res.*, 76 Hawai'i 259, 262 n. 2, 874 P.2d 1084, 1087 n. 2 (1994) (holding that appellant failed to raise issue of improper rule-making in the circuit court, therefore issue was waived on appeal).

**21.** In this argument, Director apparently incorporates its objections to the court's reliance on chapters 91 and 372 and HAR Rule 12–30–10.

**22.** In this argument, Director incorporates its objections to the court's reliance on HRS § 372–4 and HRS § 91–14(g)(1)–(4).

court erroneously concluded approval of the application was unlawful based on the fact that the signatory employers listed in the Carpenters' application did not then possess the requisite licenses.[23] [Opening Brief (OB) at 6–10]

### IV.

■ We believe Appellees' first ground is dispositive. "[I]f a court lacks jurisdiction over the subject matter of a proceeding, any judgment rendered in that proceeding is invalid[, t]herefore, such a question is valid at any stage of the case[.]" *Bush v. Hawaiian Homes Comm'n*, 76 Hawai'i 128, 133, 870 P.2d 1272, 1277 (1994) (brackets and internal quotation marks omitted). "Subject matter jurisdiction is concerned with whether the court has the power to hear a case." *Pele Def. Fund v. Puna Geothermal Venture*, 77 Hawai'i 64, 67, 881 P.2d 1210, 1213 (1994) (quoting *Maryland Waste Coalition v. Maryland Dep't of Environment*, 84 Md.App. 544, 581 A.2d 60, 61 (Md.1990)).

■ We observe, initially, that there was no contested case hearing. Appellants concede in their May 27, 1999 notice of appeal that "[a]s of the date of this appeal the Director has not held a Chapter 91 hearing as required by law." To be entitled to judicial review of the Director's decision, appellees "must have participated in a 'contested case' hearing." *Alejado v. City & County of Honolulu*, 89 Hawai'i 221, 226, 971 P.2d 310, 315 (App.1998). HRS § 91–14(a) (1993) which pertains to agency proceedings, provides in relevant part that "[a]ny person aggrieved by a final decision and order *in a contested case ... is entitled to judicial review* thereof under this chapter[.]" (Emphasis added.) A contested case is "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing." HRS § 91–1(5) (1993). An agency hearing is "such hearing held by an agency immediately prior to a judicial review of a contested case as provided in section 91–14." HRS § 91–1(6) (1993).

HRS § 91–1(1) defines agency as "each state or county board, commission, department, or officer authorized by law to make rules or to adjudicate contested cases, except those in the legislative or judicial branches." The Director is authorized to make rules inasmuch as he is empowered to "[i]ssue such rules and regulations as may be necessary to carry out the intent and purpose of this chapter [chapter 372]." HRS § 372–5(8). The Director, thus, is an agency. The Director did not convene a contested case hearing from which judicial review may be obtained.

### V.

Appellants appear to argue that the meetings of the SAC were contested case hearings. But, the SAC meetings were not contested case hearings within the meaning of HRS chapter 91. The SAC does not satisfy the definition of an "agency" because it was not "authorized by law to make rules or adjudicate cases." *RGIS Inventory Specialist v. Hawai'i Civil Rights Comm'n*, 104 Hawai'i 158, 86 P.3d 449 (2004) (holding that Director of Hawai'i Civil Rights Commission was not an agency because he neither made rules nor adjudicated cases). Prior to 1967 when the sections dealing with the powers of the Director and the apprenticeship council were amended, the Director could register apprenticeship agreements only "when so authorized by the Apprenticeship Council[.]" Revised Laws (RL) 1955 § 89–6. In 1967, RL 1955 § 89–4 was amended to read that "the apprenticeship council ... shall sit in an advisory capacity[.]" Act 20, Session Laws of Hawai'i 1967. Obviously, the Legislature intended by its amendment that the SAC would only serve in an advisory capacity. Therefore, the SAC could not have conducted a contested case hearing within the meaning of HRS § 91–1(5).

In *Sandy Beach Def. Fund v. City Council*, 70 Haw. 361, 370, 773 P.2d 250, 256 (1989) this court held that the City Council, as a legislative branch of the county, is not subject to the procedural requirements of Hawai'i Administrative Procedure Act. This

---

**23.** In this argument Director appears to incorporate its objections to the court's reliance on Ha-

wai'i Administrative Rules §§ 12–30–6(2)(J) and (S) and HRS §§ 91–14(g)(1) and (4).

court's holding was based on *Kailua Cmty. Council v. County of Honolulu,* 60 Haw. 428, 591 P.2d 602 (1979) which stated that the chief planning officer [CPO] and the planning commission "are performing a purely advisory function ... [therefore] the CPO and the department are not subject to the requirements of HAPA." *Id.* at 434, 591 P.2d at 606. Likewise, inasmuch as the SAC served only in an advisory capacity, its meetings cannot be considered contested case hearings.

Appellants seem to argue that a contested case was required similar to the holding in *Seattle Bldg. & Constr. v. Apprenticeship & Training Council,* 129 Wash.2d 787, 920 P.2d 581 (1996). In *Seattle Bldg. & Constr.,* labor unions challenged the registration approval granted by a Washington advisory council. *Id.* at 583. In that case, the duty the agency allegedly failed to perform was the failure to hold an adjudicatory hearing required by RCW [Revised ' Code of Washington] 34.05.422(1)(b)." *Id.* at 586. RCW 34.05.570(4)(b). RCW 34.05.422(1)(b) "provides that review of denials of applications for *licenses* or rate changes shall be conducted as adjudicative proceedings." *Id.* at 587 (emphasis added.)

The Washington appellate court explained that "apprenticeship council *approval is a prerequisite* to coverage under other statutory provisions." *Id.* at 587 (emphasis added). One of those statutory provisions provided that apprentices "must be paid the prevailing wage rate for apprentices in the trade" (RCW 39.12.021) and the other, that apprentices are allowed "workers compensation benefits for the time spent in ... [instructional] classes[.]" *Id.* at 587. The Washington court reasoned that these "benefits" conferred by statute "may be obtained as a result of agency approval [of apprenticeship programs] ... [therefore] agency approval [of such programs] is a 'license.'" *Id.* at 588. As such, the court concluded that the labor unions should have been afforded an adjudicatory hearing under RCW 34.05.422(1)(b) for "denial of licenses".

*Seattle Bldg. & Constr.* is distinguishable from this case. Here, the Director granted the application for registration. Under the express language of the statute, the advisory role of the SAC did not substitute for the final decision of the Director.[24] SAC approval was not a prerequisite to registration. The Legislature expressly removed the power originally delegated to the SAC to approve apprenticeship programs and altered the SAC's role to one that is merely advisory. Therefore, *Seattle Bldg. & Constr.* was based on a statutory scheme unlike our own.

## VI.

Inasmuch as no contested case hearing was held, it must be decided whether a contested case hearing should have been held. "In order to determine whether [appellees] participated in, or [are] entitled to, a contested case hearing, we must determine whether [appellees'] 'legal rights, duties, or privileges ... are *required by law* to be determined after an opportunity for agency hearing.'" *Alejado v. City & County of Honolulu,* 89 Hawai'i 221, 226, 971 P.2d 310, 315 (App.1998) (quoting HRS § 91–1(5)). The Intermediate Court of Appeals in *Alejado,* explained that "[t]he phrase 'required by law' embraces both constitutional [and] statutory law." *Id.* (quoting *Bush v. Hawaiian Homes Comm'n,* 76 Hawai'i 128, 134–35, 870 P.2d 1272, 1278–79 (1994)).

## VII.

As to a basis in statutory law, HRS chapter 372 does not contain any provision requiring an agency hearing with respect to the registration of an apprenticeship program. Therefore, there is no statutory right to a contested case hearing afforded by Chapter 372 as to the Director's decision to register an apprenticeship program.

Whether Appellants were entitled to a contested case hearing, then must rest on the constitutional due process claim referred to in the court's order denying the DLIR's motion to dismiss. Appellants apparently allege a property interest on behalf of the taper and painter "apprentices who are currently enrolled in parallel programs [who] enjoy 'enti-

---

**24.** On the other hand, the Director states that *denial* of an apprenticeship program application may require an HRS chapter 91 proceeding. (Emphasis added.)

tlements' created by chapter 372, HRS, as specifically detailed in 'apprenticeship agreements' which are signed by the program sponsors, the apprentice and the department."

Appellants argue that the "approval of the registration request of a competing carpenters apprenticeship program for tapers and painters clearly required a constitutionally mandated due process hearing because the agency action impacted directly upon the work opportunities of the 74 tapers and 294 painter apprentices registered in parallel programs." (Emphasis added.) They contend the registration of a competing program would "necessarily entail temporary suspensions and cancellations of 'apprenticeship agreements' ... amount[ing] to de facto deregistration[.]"

## VIII.

■ It is established that "[t]he Fourteenth Amendment's procedural [due process] protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits.[25] These interests-property interests—may take many forms." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). But, "the range of interests protected by procedural due process is not infinite." *Id.* at 570, 92 S.Ct. 2701. "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. 2701. This court has held that in order to have a property interest in a benefit, a person must have more than an "abstract need or desire for it," and more than "a unilateral expectation of it," he must "*have a legitimate claim of entitlement to it.*" *Bush*, 76 Hawai'i at 136, 870 P.2d at 1280 (Emphasis added) (quoting *Sandy Beach Def. Fund*, 70 Haw. at 377, 773 P.2d at 260 (1989) (internal quotation marks and brackets omitted)).

■ Appellants seemingly argue that their apprentices are entitled to benefits authorized under HRS § 372-3 which "affords to each registered apprentice assurances of 'reasonable continuous employment' with on-the-job training by qualified journeyworkers on a one to one basis."[26] As to such claimed "benefits" we note, that nowhere in HRS chapter 372 is the government obligated to ensure or to provide such "benefits." As previously stated, the standards listed in HRS § 372-3[27] define the required terms of an apprenticeship agreement. The apprenticeship agreements are signed by the program sponsors, the apprentice and the DLIR. However, the DLIR is not obligated to provide any of the "benefits" extended under the program. As mentioned before, an apprenticeship agreement "is entered into between an apprentice and (1) an employer, (2) an association of employers, (3) an organization of employees, or (4) a joint committee representing employers and employees." HRS § 372-2.

Indeed, an employer may transfer his obligation under the apprenticeship program to another employer, apparently without prior approval of the Director. HRS § 372-3(10).[28] At the written request of any party during the probationary period of the agreement, HRS § 372-3(7),[29] the Director may

25. For the purpose of analysis herein, the Hawai'i Constitution Article I, section 5, contains similar due process language and would similarly apply.

26. Appellants maintain that (1) HRS § 372-3 "mandates a minimum commitment of not less than twelve months or two thousand hours of on the job training[,]" (2) "apprentices receive classroom instruction at the community college, paid for, in part, by State funds [HRS § 372-6][,]" and (3) HRS § 372-3(3) "mandates a minimum commitment of one hundred and forty-four hours per year of such 'related instruction.'"

27. For the provisions of HRS § 372-3, *see supra* note 18.

28. HRS § 372-3(10) states that the agreement must contain a "[p]rovision that if an employer is unable to fulfill the employer's obligation under the apprenticeship agreement, the employer may transfer the obligation to another employer[.]"

29. HRS § 372-3(7) states that the agreement must contain a "[p]rovision that after the probationary period the director may terminate an apprenticeship agreement upon agreement of the parties[.]"

terminate an agreement. The Director is given a "consult[ant role] regarding differences arising out of the apprenticeship agreement." HRS § 372–3(8).[30] The benefits under apprenticeship agreements are, therefore, obligations undertaken *between or among private parties.* While the Director is authorized to register and promote such agreements, and may suspend or terminate such programs, HRS § 372–5, *see supra* page 281, 88 P.3d 653, the statute provides no basis for extracting from such provisions a right of continued employment and education, *see supra* note 27, guaranteed by the government. The property interest posed here, vis-a-vis the DLIR, amounts to a "unilateral expectation". *Bush,* 76 Hawai'i at 136, 870 P.2d at 1280.

Appellants, further contend that because "registered apprentices and their sponsors have rights to contest a temporary suspension or cancellation of an apprenticeship agreement by the department in a chapter 91 hearing[,]"[31] the apprentices have "entitlements" created under HRS § 372–3. This is not the case because the registration of an apprenticeship program is not the equivalent of a temporary suspension or cancellation of an apprenticeship agreement. Moreover, as previously mentioned, such entitlements or benefits are not statutory obligations imposed on the DLIR.

Appellants contend that, as to existing programs, they have an "interest in contesting what they believe to be inadequate standards in order to prevent entry of new, substandard programs into the market which will deplete the work opportunities of apprentices

of existing programs including their own." *Seattle Bldg. Council,* 920 P.2d at 585. Plainly, HRS § 372 does not provide protection from competition for one apprenticeship program as against another. The terms of the statute do not promise to apprentices continued employment or training despite registration of another apprenticeship program or Appellants' freedom from competition from another program. As a result, there is no legitimate claim to a property interest free of competition. *See Bush,* 76 Hawai'i at 136, 870 P.2d at 1280

As to the alleged "substandard" status of the Carpenters' program, the Director's approval was evidently based on Young's statement that "prior to recruitment and/or registration of apprentices, WDD conducts a review of the program to ensure its compliance with the standards." [32] Accordingly, no agreements with apprentices were executed under the Carpenters' program, pending proper licensing of sponsors. Consequently, there was no adverse effect on existing programs and currently placed apprentices caused by the registration. The claim here, thus, is raised in the "abstract." *See Bush,* 76 Hawai'i at 136, 870 P.2d at 1280.

## IX.

We conclude, thus, that the court lacked jurisdiction because (1) the appeal was not from a contested case hearing and (2) Appellants did not demonstrate they were entitled to a contested case hearing. For the foregoing reasons, the October 11, 2000 order of the court vacating the DLIR's decision is

---

**30.** HRS § 372–3(8) states that the agreement must contain a "[p]rovision that the services of the department may be utilized for consultation regarding the settlement of differences arising out of the apprenticeship agreement where the differences cannot be adjusted locally or in accordance with the established trade procedure[.]"

**31.** Although Appellants do not clearly state the basis for this assertion, HAR Rule 12–30–8 outlines the procedures for suspension and/or cancellation of an apprenticeship agreement.

**32.** According to the DLIR, the department's "[p]ast practice has been to determine whether the program proposal, rather than the program *per se,* is in compliance with these standards …

because most new programs are not fully established at the time an application for registration is submitted." As explained by the DLIR, "[t]he [d]epartment's application of the standards recognizes that new programs may not be able to gain registration if they are required to hire personnel before the program is approved, especially since approval could take months." The DLIR reasons that "the pragmatic approach taken by the [d]epartment fulfills the purpose of the statute by encouraging sponsors to develop apprenticeship programs without a large outlay of funds before approval." Consequently, "requiring hiring of personnel before approval would deter new programs which is contrary to the [d]irector's mandate to 'encourage and promote the making of apprenticeship agreements. HRS § 372–5(3).'"

vacated and the case remanded with instructions to the court to enter an order granting DLIR's June 16, 1999 motion to dismiss appellants' notice of appeal.