168 P.3d 929

Joseph A. BRESCIA, Plaintiff/Appellant–
Appellee

v.

NORTH SHORE OHANA, Harold Bron-
stein and Caren Diamond, Defen-
dants/Appellees–Appellants.

and

Planning Commission of the County
of Kauai, Defendant/Appellee.

No. 27211.

Supreme Court of Hawai'i.

July 12, 2007.

Reconsideration Denied Aug. 31, 2007.

Harold Bronstein, Lihue, on the briefs, for defendants/appellees-appellants.

Walton D.Y. Hong, Lihue, on the briefs, for plaintiff/appellant-appellee.

NAKAYAMA, ACOBA, and DUFFY, JJ.; with LEVINSON, J., concurring separately, and with whom MOON, C.J., joins.

Opinion of the Court by ACOBA, J.

We hold in this secondary appeal by Defendants/Appellees–Appellants North Shore Ohana, Harold Bronstein, and Caren Diamond [hereinafter collectively, "Appellants"], from the March 4, 2005 judgment of the circuit court of the fifth circuit [1] (the court) issued pursuant to the court's March 4, 2005 findings of fact, conclusions of law, decision and order reversing and remanding, in favor of Plaintiff/Appellant–Appellee Joseph A. Brescia (Brescia), the June 10, 2003 decision of Defendant/Appellee Kaua'i County Planning Commission (the Commission) to deny Brescia's application, the June 16, 2003 Commission's order denying Brescia's motion for reconsideration, and the Commission's findings of fact, conclusions of law, decision and order dated September 9, 2003 (2003 order),

that: (1) the Commission's decision in enforcing the shoreline setback line as shown on the July 1, 1983 subdivision map is supported by reliable, probative, and substantial evidence, (2) the Commission did not act arbitrarily or abuse its discretion in denying Brescia's request for an amendment or variance as to his lot to build within 31 feet of the shoreline, given that, *inter alia,* other shoreline setbacks in the area ranged from approximately 35 to 80 feet, (3) Brescia did not have a right to rely on representations of the County of Kaua'i Planning Department (Planning Department), if any, as to any purported setback boundary inasmuch as (a) the Commission retained the authority to establish shoreline setbacks within the Special Management Area (SMA), as opposed to any individual planning department employee, and (b) Brescia was on notice that a restriction in his deed provided that the Commission could impose a greater shoreline setback at the time of building permit review, (4) Brescia was not vested with a sufficient property interest to implicate any alleged due process violation and, in any event, at the time of building permit review he was given a full public hearing by the Commission, and (5) inasmuch as Brescia acknowledged to the Commission that utilizing the Developer's Setback provided Brescia with between 4,203 sq. ft. and 4,974 sq. ft. of buildable area, and Brescia's own architect testified that utilizing the Developer's Setback did not necessarily make the lot unbuildable, Brescia did not demonstrate that he was denied reasonable use of his property. Accordingly, we vacate the court's March 4, 2005 judgment, and remand to the court with instructions to enter judgment affirming the 2003 order.

I.

A.

The subject property owned by Brescia is Lot 6 within the 15–lot [2] Wainiha Subdivision

---

1. The Honorable George M. Masuoka presided.

2. Differing accounts are present as to whether the subdivision includes 15 or 16 lots. This is not material, however, to our discussion.

II, located on the makai[3] side of Alealea Road on the north shore of the island of Kaua'i. The subdivision is located in the SMA along the shoreline. Any development in the SMA is governed by the Coastal Zone Management Act (CZMA), codified in Hawai'i Revised Statutes (HRS) chapter 205A. The CZMA includes guidelines for development within the SMA. The legislature, finding that "special controls on developments within an area along the shoreline are necessary to avoid permanent losses of valuable resources and the foreclosure of management options," HRS § 205A–21 (2001), delegated the responsibility to each of the counties of enforcing the objectives and policies of the CZMA and of issuing SMA permits in accordance with the statute's mandates. A policy under the CZMA is to "[e]nsure that new developments are compatible with their visual environment by designing and locating such developments to minimize the alteration of natural landforms and existing public views to and along the shoreline[.]" HRS § 205A–2(c)(3)(B) (2001). Further, an objective of the CZMA is to "[r]educe hazard to life and property from tsunami, storm waves, stream flooding, erosion, subsidence, and pollution." HRS § 205A–2(b)(6)(A) (2001).

On Kaua'i, the Commission is the body charged with implementation of the CZMA. In that regard, the Commission adopted the Planning Department's "Shoreline Setback Rules and Regulations" [hereinafter "Kaua'i Rules"] in furtherance of this obligation. HRS § 205A–48 (2001), entitled "Conflict of other laws," states in relevant part that "[i]n case of a conflict between the requirements of any other state law or county ordinance regarding shoreline setback lines, the more restrictive requirements shall apply in furthering the purposes of this part."

### B.

This is the second time the Wainiha Subdivision II has been considered by this court. On October 25, 1978, the Commission approved SMA Permit (U)–79–1 allowing for the development of the subdivision. The Commission's issuance of SMA (U)–79–1 was subsequently challenged and eventually overturned by this court in *Mahuiki v. Planning Comm'n,* 65 Haw. 506, 654 P.2d 874 (1982).

On July 5, 1983, developer Alex Ferreira (the Developer) reapplied for an SMA Use Permit. The Developer proposed a 22–lot subdivision. Included within his application was a proposed preliminary subdivision plan map dated July 1, 1983, on which the Developer designated a so-called "Zoning District Boundary Setback Line" [hereinafter "Developer's Setback"]. The Developer also included in his application an Environmental Assessment which stated, *inter alia,* that "[n]o structures are allowed within 40 feet of the certified shoreline and, therefore, the shoreline area will not be affected."

After community opposition was expressed, the Developer presented a second proposal for a 20–lot subdivision, again indicating the same Developer's Setback on a map dated September 19, 1983. A third plan proposing 19 lots was also submitted at the same time, and it too included a map indicating the Developer's Setback. The Director of the Planning Department stated the following, *inter alia,* in his evaluation of these two proposals:

*ADDITIONAL FINDINGS:*

. . . .

Additionally, [the Developer] proposed the following restrictions applicable to either design scheme chosen:

1. *All building plans subject to design review and approval by the Planning Department prior to building permit/zoning permit approval.*

. . . .

*EVALUATION:*

. . . [R]evisions to the subdivision are necessary due to the following:

. . . .

3. Lots 2 and 3 may not have sufficient buildable area due to the *required 40 feet setback from the certified shoreline.*

---

3. "Makai" is defined as "ocean," or "toward the sea[.]" Mary Kawena Pukui & Samuel H. El-

bert, *Hawaiian Dictionary* 225 (rev. ed.1986).

1. This shoreline property is located within the Urban Land Use District, is further zoned Residential District (R–4), *with a strip along the shoreline zoned Open District (O). The North Shore Development Plan Update maintains the Open District (0) to avoid the undue encroachment of structures onto the shoreline.*

 . . . .

*CONCLUSION:*

Based on the foregoing, it is concluded that the design alternatives conform to the Kauai General Plan, the Comprehensive Zoning Ordinance, and the Subdivision Ordinance. *It is further concluded that adverse environmental and ecological effects can be minimized, and that the project can be consistent with the [SMA] objectives, policies and guidelines contained in Chapter 205–A of the [HRS], and Rules and Regulations of the County of Kauai relating to objectives, policies and guidelines, respectively, provided that:*

1. *Proper shoreline and building setbacks are established;*

 . . . .

It is also concluded that provided all these restrictions are established, it is not necessary to select a design alternative and that such decision could be made at time of subdivision review and approval. *In meeting SMA objectives, it is more important to establish the restrictions and criteria at this time and not necessarily the subdivision layout.*

(Emphases added.)

After continued opposition by both community members and members of the Commission, the Developer presented a fourth proposal for a 15–lot subdivision. Like all of its predecessor proposals, it was accompanied by a map that included the same Developer's Setback. On December 15, 1983, the Commission issued its "Findings of Fact, Conclusions of Law, Decision and Order" approving SMA (U)–84–2. No reference to the maps presented in the proceedings was made in the SMA (U)–84–2 order. However, the Commission's findings included the following:

*DESCRIPTION OF REAL PROPERTY*

. . . .

10. . . . The Zoning for the property is "Residential District (R–4)" and Open District (O). *The Open District strip is approximately 40–75 feet wide. The property is within the [SMA] district.*

. . . .

12. The draft North Shore Development Plan Update ("North Shore Update"), as approved by the Planning Commission, recommends that the subject site and surrounding properties be rezoned from its present Residential District (R–4)/Open District (O) to Residential District (R–2)/Open District (O) due to their location in a coastal high hazard zone area . . . and due to the rural nature of the area. *As of this date, the North Shore Update is still subject to:* a) public hearings at the County Council level; b) County Council review and approval; and c) review and approval by the Mayor.

. . . .

*SMA REQUIREMENTS*

22. The North Shore of Kauai has long been recognized for its natural beauty and scenic qualities. The goals of the North Shore Development Plan Update reflect that the area's unique natural beauty and special rural charm should be preserved. Haena definitely reflects these characteristics, and any development within the area should be sensitive to the qualities that make it a special place. *An objective of Hawaii's [CZMA] is to "protect, preserve and where desirable, restore or improve the quality of coastal scenic and open space resources."*

*A supporting policy of this objective is to "insure that new developments are compatible with their visual environment by designing and locating such developments to minimize the alteration of natural landforms and existing public views to and along the shoreline."*

*Another objective relates to reducing hazard to life and property from tsunami, storm waves, etc., with a supporting policy being to "control development in areas subject to storm wave, tsunami, flood, erosion, and subsistence hazard."*

*The Haena area does have a fragile environment and is deserving of protection, making it necessary to enforce the above-stated goals and objectives.* Any development should reflect and be harmonious with the present character of Haena.

23. . . . .

. . . [T]o further protect the quality of coastal scenic and open space resources, the subdivision of the real property should and will be subject to the following restrictions:

. . . .

(b) *No construction shall be allowed within the Open zoned portion of the real property along the shoreline . . .* [and] lots shall be as wide as possible so as to maximize view planes to the shoreline; and the overall layout of the subdivision shall be subject to Planning Commission approval.

(Emphases added.)

The Commission's conclusions in the SMA (U)–84–2 order included, *inter alia,* the following:

1. The Planning Commission has jurisdiction over this application pursuant to HRS Chapter 205–A and the SMA Rules, and has the power under said statutes and rules to impose reasonable restrictions and conditions in the development of the real property herein.

. . . .

4. It is further concluded that provided that the restrictions as noted above are established, it is not necessary to select a design alternative and that such decision could be made at time of subdivision review and approval. In meeting SMA objectives, it is more important to establish the restrictions and criteria at this time.

Among the conditions enumerated in the SMA (U)–84–2 order, in light of the "visual sensitivity of the site" were the following:

2. *Due to the visual sensitivity of the site in relation to its scenic location on the North Shore:*

a) Building locations, materials, and designs shall be subject to [the Commission's] review and approval at the time of building and zoning permit application. The building locations shall be constructed on the ground in strict adherence to the approved subdivision map and building plot plan.

b) *All building setbacks shall be measured from a current certified shoreline at time of development. No part of any structure shall penetrate the Open zone strip fronting the shoreline.*

c) Buildings shall be limited to one story above the flood elevation.

. . . .

h) The setback from Alealea Road and Alamo'o Road shall be a minimum of 20 feet. All other front yard setbacks shall be 15 feet. The side yard setbacks shall be a minimum of 10 feet. *Increased setbacks shall be required by the Planning Commission at time of zoning and building permit review if the design of a residence warrants a greater setback(s).*

*All of the above requirements shall be established as restrictive covenants within each deed at the time of subdivision.*

. . . .

8. The overall subdivision design and layout shall be *subject to the review and approval of the [Commission] in accordance with SMA requirements.* The subdivision lots shall be as wide as possible and *shall be positioned so*

*as to maximize view planes to the shoreline.*

(Emphases added.)

After the issuance of SMA (U)–84–2, the Commission on April 11, 1984, granted the Developer tentative subdivision approval for a 15–lot subdivision, which differed in layout from the previous (fourth) 15–lot proposal submitted by the Developer. Once again, however, conditions of the approval were that all building setbacks be measured from a certified shoreline, that no part of any structure penetrate the Open zone strip fronting the shoreline, and that these restrictions be made part of all subdivision deeds. After obtaining tentative subdivision approval, the Developer sold the property to Sylvester Stallone (Stallone), who subsequently sought approval of the final subdivision map.

On March 13, 1985, the Commission approved the final subdivision map. The final subdivision map, later recorded as File Plan 1840, did not contain the Developer's Setback which had appeared on all previous maps submitted to the Commission. Section 9–3.8 of the Kaua'i County Code, entitled "Final Subdivision Map," requires that the final subdivision map indicate, among other things, setback lines. Additionally, Section 9–3.8(c)(5) of the Code, entitled "Errors and Discrepancies," stated:

> The approval of the final subdivision map by the Planning Commission shall not relieve the applicant of the responsibility for any error in the dimensions or other discrepancies or oversights. Errors, discrepancies, or oversights shall be revised or corrected, upon request[,] to the satisfaction of the Planning Commission.

On February 20, 1992, the Declaration of Covenants, Conditions and Restrictions [hereinafter "CC & Rs"] for the subdivision was recorded at the State Bureau of Conveyances. The CC & Rs stated, *inter alia,* the following:

### DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR WAINIHA SUBDIVISION–II

. . . .

### RECITALS

. . . .

WHEREAS, *as a condition to final subdivision approval for the Property by the [Commission], certain restrictive covenants were imposed upon the Property, which restrictive covenants are stated in Schedule "B"* attached hereto and made a part hereof[.]

WHEREAS, [Stallone], by making this Declaration, *desires to enhance and protect the value, desirability and attractiveness of the Property;* and

NOW, THEREFORE, [Stallone] *for the mutual benefit and protection of all Owners* (as hereinafter defined), hereby declares that *the Property shall be held, leased, encumbered, conveyed, sold, used, occupied and improved, subject to and with the benefit and protection of the limitations, restrictions, covenants and conditions set forth in this Declaration, all of which are established and declared and agreed to be for the purpose of enhancing and protecting the value, desirability and attractiveness of the Property. These limitations, restrictions, covenants and conditions shall run with the Property and shall inure to the benefit of and be binding on all parties* having or who acquire any right, title or interest in the Property or any part thereof, their heirs, personal representatives, successors and assigns.

. . . .

### ARTICLE II

### USE RESTRICTIONS

Section 1. *County Restrictions. All Owners shall comply with the covenants, conditions and restrictions contained in Schedule "B"* attached hereto. In the event there is any inconsistency between Schedule "B" and the terms and conditions of this Declaration, Schedule "B" shall control.

Section 2. *Construction.* No building . . . shall be constructed . . . until the complete plans, drawings and specifications therefor . . . have been submitted to and approved by the Design Committee. . . .

No residence shall contain less than 2,500 square feet of covered space (excluding garage, lanais and outbuildings).

. . . .

Section 5. *Setback Lines.* All building setbacks shall conform to the requirements stated in Paragraph 8 of Schedule "B" attached hereto. . . . .

Schedule "B" is a restatement of the conditions of approval in SMA (U)–84–2, and states in relevant part:

SCHEDULE "B" COVENANTS, CONDITIONS AND RESTRICTIONS FOR *WAINIHA SUBDIVISION—II*

. . . .

1. Building locations, materials and designs shall be subject to [Commission] review and approval at the time of building and zoning permit application. . . .

2. *All building setbacks shall be measured from a current certified shoreline at the time of development. No part of any structure shall penetrate the Open zone strip fronting the shoreline.*

. . . .

8. . . . . *Increased setbacks shall be required by the [Commission] at time of zoning and building permit review if the design of a residence warrants a greater setback(s).*

. . . .

10. There shall be no reversing movements onto Alealea Road. Each lot shall provide for its own turn-around.

(Emphases added.)

On February 11, 2000, Brescia and Jodie A. Brescia purchased Lot 6 of the subdivision by Warranty Deed (deed), recorded on February 23, 2000. According to Brescia, Lot 6 is a funnel-shaped flag lot, with the top of the "funnel" being the shoreline. The Commission found Lot 6 is the most seaward and visually prominent lot within the subdivision. Eleven of the lots in the subdivision, including Lot 6, abut the shoreline.

On December 11, 2001, the owner of neighboring Lot 9 appeared before the Commission to seek a Building Location, Material and Design Review in accordance with SMA (U)–84–2. The Commission unanimously voted that the owner was required to comply with the setback identified in SMA (U)–84–2 order, as restated in the CC & Rs attached to the deed, and as illustrated on the Developer's original proposal map dated July 1, 1983. The July 1, 1983 map indicates a setback on Brescia's lot of approximately 61 feet at the northeastern makai corner ranging to about 71 feet at the northwestern makai corner.

On September 3, 2002, Brescia's attorney submitted a letter to the Commission in which he stated, "Please consider this letter as a request for all necessary permits and approvals to allow the proposed single family residence on the property." Brescia sought "an Amendment to SMA (U)–84–2 to allow the applicant 'to deviate from the building setback line deemed by the Planning Department to be applicable to the lot . . .'; a Class I Zoning Permit; and a Shoreline Setback Variance." According to Brescia's application, a setback of approximately 63 feet as shown on the July 1, 1983 map would allow for a triangular-shaped buildable area of approximately 4,974 square feet. Within this area, Brescia must construct, in accordance with the CC & Rs, a residence of at least 2,500 square feet-excluding garage, lanais, a required turnaround area, and septic system.

Kaua'i Rules Section 5, entitled "Shoreline Setback Lines," states:

Shoreline setback lines are established throughout the County of Kauai at 40 feet inland from the upper reaches of the washes of the waves other than storm and tidal waves, except that such shoreline setback lines shall be 20 feet inland on any land parcel of record when any one or more of the following exist:

. . . .

c. *Where the buildable area of the parcel is reduced to less than 50 percent of the parcel area after applying the 40 foot shoreline setback line and all State and County requirements* wherein the parcel is located including but not limited to front and side yard setbacks, cross-slope requirements, and terrain requirements.

*Shoreline setbacks established at [a] distance greater than that established by the Commission shall be administered and enforced under such county setback ordinances in conjunction with these rules and regulations.*

(Emphases added.)

Under the CZMA, a variance may be granted for private facilities if the Commission "finds in writing, based on the record presented," that the variance is "clearly in the public interest[,]" or that "hardship will result to the applicant if the facilities or improvements are not allowed within the shoreline area[.]" HRS § 205A–46(a)(7)–(8) (2001).[4] Although the legislature in HRS § 205A–46(b) assigned the Commission the task of defining hardship with respect to SMA variances, Kaua'i County has not defined "hardship" in its rules for the purposes of evaluating shoreline setbacks.[5]

4. HRS § 205A–46 (2001) states in relevant part:

(a) A variance *may* be granted for a structure or activity otherwise prohibited by this part if the authority finds in writing, *based on the record presented*, that the proposed structure or activity is necessary for or ancillary to:
 . . . .
 (7) Private facilities or improvements that are clearly in the public interest;
 (8) Private facilities or improvements which will neither adversely affect beach processes nor artificially fix the shoreline; provided that the authority also finds that *hardship will result* to the applicant if the facilities or improvements are not allowed within the shoreline area;
 . . . .

(b) *Hardship shall be defined in rules adopted by the authority under chapter 91. Hardship shall not be determined* as a result of county zoning changes, planned development permits, cluster permits, or subdivision approvals after June 16, 1989, or *as a result of any other permit or approval listed in rules adopted by the authority.*

(c) *No variance shall be granted unless appropriate conditions are imposed:*
 . . . .
 (4) *To minimize adverse impacts on public views to, from, and along the shoreline.*
(Emphases added.)

5. Section 12(b) of the Kaua'i Rules, entitled "Administration of These Rules and Regulations," states in relevant part:

The Agency, through its Director, shall receive and review plans for proposed structures, facilities, or activities that are prohibited within the shoreline setback upon the submission of ade-

On December 10, 2002, Brescia submitted a County of Kaua'i, Department of Planning application form in order to seek a Building Permit and an Amendment to SMA (U)–84–2, or in the alternative, a variance.[6] The form contained a printed section entitled "For Variance or Use Permits only," and states, "Conditions justifying Variance or Use Permit application: (use additional sheets as required)." As justification for the variance, Brescia wrote, "[S]ee letter of [Brescia's attorney], dated September 3, 2002," referred to *supra*. Brescia's attorney stated in the September 3, 2002 letter that Brescia's proposed 3,600[7] square foot residence would be "31 feet inland of the certified shoreline at its nearest point[.]" The letter states:

In support and justification for his requests, [Brescia] brings the following to

quate plans and data attached to a properly executed application form requesting a variance through the Planning Commission of the County of Kauai. . . .
Applications for a variance from these rules and regulations *shall be accompanied by accurate written statements to substantiate that:*
 (1) such structure, activity, or facility is in the public interest; or
 (2) *hardship will be caused to the applicant if the proposed structure, activity, or facility is not allowed on that portion of the land within the shoreline setback.*
(Emphases added.)

6. In the absence of a definition of "hardship" in the Kaua'i Rules, Brescia notes in his answering brief that, "[t]he County's Comprehensive Zoning Ordinance (CZO) similarly recognizes that there may be a need for a variance in appropriate circumstances, for the Planning Commission may grant variances . . . [where] the strict application of the regulations deprives the property of privileges enjoyed by other property [owners] in the vicinity and within the same District, and the applicant shows that he cannot make a reasonable use of the property if the regulations are applied."

7. In the application to the Commission, Brescia represented the square footage of the structure to be 3,600 square feet. In his opening brief to the Commission, Brescia also represented that he was requesting a structure "containing approximately 3,600 square feet." However, in his opening brief to this court Brescia states that he "applied on September 3, 2002 for approval of a single family residence on Lot 6" for a "proposed 3,300 square foot structure."

the attention and consideration of the Commission: ... The Applicant's residence would *not* be the only residence in the subdivision or along that stretch of coastline built as close to the shoreline. The existing residence on Lot 4 of the subdivision is approximately 30 feet from the shoreline.

(Emphasis added.) However, on appeal to this court Brescia acknowledges in his answering brief that, contrary to his September 3, 2002 letter, setbacks in the area range from 35 to 80 feet. Further, Brescia also acknowledges that the setback on neighboring Lot 4 is not the 30 feet represented in his application to the Commission, but is in fact 40 feet.

On January 28, 2003, the Commission held a hearing, at which time Appellants were granted intervenor status. Brescia's architect testified that utilizing a setback of approximately 60 feet as indicated by the developer's original proposal map dated July 1, 1983, makes the triangular-shaped lot "almost become unbuildable.... [Y]ou cannot get a reasonable structure there." Brescia argued that, since no setback was illustrated on the final subdivision map, the "Open District strip" referred to in the SMA (U)–84–2 order is the line shown on the County Zoning Maps. Rather than imposing a setback on Lot 6 of approximately 61 to 71 feet at each makai corner as does the Developer's Setback, the County Zoning Map would impose a setback on Lot 6 of about 9 to 22 feet at each makai corner. The County Zoning Maps were adopted by ordinance as part of Section 8–2.2 of the Kaua'i County Code (1987).

After having conducted a site visit to the property and hearing oral argument from all parties, the Commission denied Brescia's application on June 10, 2003. On June 16, 2003, Brescia filed a Motion for Reconsideration. On June 24, 2003, the Commission denied Brescia's motion. On September 9, 2003, the Commission entered its Findings of Fact, Conclusions of Law, Decision and Order. The relevant findings of the 2003 order state as follows:

1. The Wainiha Subdivision II ... was approved under [SMA] Use Permit SMA (U)–84–2, and Subdivision S–84–58.

2. *On December 15, 1983, the [Commission] issued its [findings, conclusions, D & O] approving SMA (U)–84–2.*

3. *The [Commission's findings] ... state the following:*

 . . . .

 10. ... The Zoning for the property is "Residential District (R–4)" and Open District (O). *This Open District strip is approximately 40–75 feet wide.* The property is within the [SMA] district.

 . . . .

 22. The North Shore of Kauai has long been recognized for its natural beauty and scenic qualities. . . .

 23. . . . .

 Therefore, to further protect the quality of coastal scenic and open space resources, the subdivision of the real property should and will be subject to the following restrictions:

 . . . .

 (b) *No construction shall be allowed within the Open zoned portion of the real property along the shoreline ...*

. . . .

5. The approval of SMA (U)–84–2 was subject to conditions, which state in part:

 . . . .

 2. Due to the visual sensitivity of the site in relation to its scenic location on the North Shore:

 a) *Building locations ... and designs shall be subject to [Commission] review and approval at the time of building and zoning permit application. ...*

 b) All building setbacks shall be measured from a current certified shoreline at time of development. *No part of any structure shall penetrate the Open zone strip fronting the shoreline.*

 . . . .

 .

*All of the above requirements shall be established as restrictive covenants within each deed at the time of subdivision.*

. . . .

6. *The Application for SMA (U)–84–2 included the Preliminary Subdivision map dated July 1, 1983 which identified the area fronting the [Developer's Setback] relied upon by the [Commission] . . . in . . . approving SMA (U)–84–2.*

. . . .

11. . . . [Brescia's] deed included the [CC & Rs] imposed by the [Commission], as required by SMA (U)–84–2. . . .

12. On December 11, 2001, the Building Location, Material and Design Review for Lot 9 of the Wainiha Subdivision [II], S–84–58, TMK 5–8–09–048 was before the [Commission]. The [Commission], in reaffirming the original intent of SMA (U)–84–2, unanimously voted on December 11, 2001 that the applicant "shall comply with the set backs identified in the Findings of Fact, Conclusions of Law, Decision and Order, for SMA (U)–84–2, dated December 15, 1983, and the original proposal map dated July 1, 1983."

. . . .

15. *According to [Brescia's] September 3, 2002 application letter, and January 28, 2003 written testimony submitted* to the [Commission] at the January 28, 2003 public hearing, *a shoreline setback of approximately 63 feet when measured from the certified shoreline dated July 26, 2002, to the [Developer's Setback] required by SMA (U)–84–2, and as shown on the proposed subdivision map dated July 1, 1983* submitted with the Application for SMA (U)–84–2, *will allow [Brescia] a triangular shaped buildable area of approximately 4,974 square feet* on which to construct a single family residence.

16. *According to [Brescia's] May 6, 2003 Opening Brief, restricting development of the area fronting the [Developer's Setback] as required by SMA (U)–84–2 and as shown on the proposed subdivision map dated July 1, 1983* submitted with the Application for SMA (U)–84–2 when measured from Alealea Road *will allow [Brescia] a triangular shaped buildable area of approximately 4,203 square feet* on which to construct a single family residence.

. . . .

20. [Brescia] submitted an Affidavit attached to his Opening Brief which stated he "was informed by Kauai County Officials", whom he did not name, [that] the "shoreline setback on Lot 6 was 20 feet inland of the certified shoreline."

(Emphases added.)

Among the Commission's conclusions were the following:

1. The Hawai'i [CZMA], HRS 205A–1, *et. seq.*, controls development in the coastal zone by the [SMA] permit process.

. . . .

5. SMA (U)–84–2 is the primary and controlling permit for the development of the Wainiha Subdivision II.

6. The conditions upon which the approval of SMA (U)–84–2 was based upon were incorporated into the [CC & Rs] of the deed [Brescia] received from [the Developer].

7. *By the deed dated February 11, 2000 which [Brescia] received from [the Developer], [Brescia] was put on notice of the requirements and conditions of SMA(U)–84–2, including the requirement that "no part of any structure shall penetrate the open zone strip fronting the shoreline" and that "[b]uilding locations, materials, and designs shall be subject to Planning Commission review and approval at the time of building and zoning permit application."*

. . . .

9. Pursuant to the goals and objectives of the [CZMA], HRS 205A–1, *et. seq,* in order to preserve and protect the quality of coastal scenic and open space resources, the Planning Commission in its Findings of Fact, Conclusions of Law, Decision and Order, *SMA (U)–84–2, dated December 15, 1983, and as identified on the proposed subdivision map dated July 1, 1983* submitted with the Application for *SMA(U)–84–2, provided for an open zone within the Wainiha Subdivision II of approximately*

40–75 feet in which "no structure shall penetrate". The [Developer's Setback] shown on the July 1, 1983 map submitted by [the Developer] is the line the [Commission] intended when it issued SMA (U)–84–2 as the line in front of which no structure shall penetrate or be built.

. . . .

11. A primary intent of the [Commission] when it issued SMA(U)–84–2 was to preserve view planes to and along the shoreline, and to protect the quality of coastal scenic and open space resources. That intent can only be accomplished by prohibiting buildings within the area fronting the [Developer's Setback] as shown on the July 1, 1983 map.

. . .

14. The unidentified "Kauai County Officials" did not have the [a]dministrative authority to make the final decision on the location of [Brescia's] building, because that decision was reserved to the [Commission].

15. The [Commission], pursuant to Section 9–3.8(d)(5) of the Kaua'i County Code, 1987, as amended, has the authority with respect to the revision or correction of approved final subdivision maps as follows:

> Errors, discrepancies, or oversights shall be revised or corrected, upon request to the satisfaction of the [Commission].

16. The area fronting the July 1, 1983 [Developer's Setback] was identified by [the Developer] and relied on by the [Commission] when it issued its Findings of Fact, Conclusions of Law, Decision and Order approving SMA (U)–84–2.

17. Prohibiting buildings within the area fronting the [Developer's Setback] will also reduce the threat of damage due to coastal hazards and help further the objective of the [CZMA] and County of Kaua'i Special Management Area Rules and Regulations to reduce hazard to life and property from tsunami, storm waves, stream flooding, and erosion.

18. Prohibiting buildings within the area fronting the [Developer's Setback] identified in the Findings of Fact, Conclusions of Law, Decision and Order, for SMA (U)–84–2, dated December 15, 1983, and on the proposed subdivision map dated July 1, 1983 submitted with the Application for SMA (U)–84–2 as it applies to Lot 6, provides [Brescia] with reasonable use of his property.

19. Reasonable use is not necessarily the use most desired by the owner of the property, and [Brescia's] compliance with SMA (U)–84–2 allows for the construction of a substantial house on the property without the applicant being denied reasonable use of the property.

. . . .

21. This decision allows [Brescia] to build a home in a triangular shaped buildable lot with a buildable area of between approximately 4,203 and 4,974 square feet depending on which calculation submitted by [Brescia] is used. . . .

22. [Brescia's] lot is the most seaward and visually prominent lot within the subdivision, and construction within the area in front of the [Developer's Setback] would result in a greater impact on the area's scenic and open space qualities, and a greater risk of damage due to coastal hazards than other lots within the subdivision.

(Emphases added.)

Finally, the 2003 order stated as follows:

> Based upon the foregoing Findings of Fact and Conclusions of Law, it is the Decision of the Planning Commission that:
>
> 1. [Brescia's] request to amend SMA (U)–84–2 or grant a variance from the conditions of SMA (U)–84–2, including the [Developer's Setback] is denied;
>
> 2. [Brescia] shall be prohibited from constructing buildings within the area fronting the [Developer's Setback] identified in the Findings of Fact, Conclusions of Law, Decision and Order, for SMA (U)–84–2, dated December 15, 1983, and the proposed subdivision map dated July 1, 1983, submitted with the Application for SMA (U)–84–2 which prohibits any structure from penetrating the open zone strip fronting the

shoreline, and this allows [Brescia] reasonable use of his property.

(Emphasis added.)

## II.

On December 12, 2003, Brescia filed a Notice of Appeal in the court. On March 4, 2005, the court issued its findings, conclusions, and Order, and Judgment pursuant

8. The court's findings included, *inter alia*, the following:

> 57. The imposition of the [Developer's Setback] on the Final Subdivision Map, under the guise of correcting the [map] exceeds the authority granted to the Commission under § 9–3.8(c)(5) of the Kauai County Code[], for it reflected a change in interpretation 16 years after the fact and not an error in dimension, discrepancy or oversight.
>
> 58. *The Open zone strip fronting the shoreline referred to in the SMA Decision and Order is the Open zone shown on the County's Zoning Map.*
> . . . .
> 72. The [Developer's Setback] shown on the July '83 Map imposed a setback of between 61 ½ and 71 feet from the shoreline for Lot 6, more than double or triple what had been represented as being the applicable setback for the subdivision to the public and Brescia.
> . . . .
> 77. *Brescia had the right to rely upon the representations of the [Planning] Department as to the applicable setbacks for the subdivision.*
> . . . .
> 86. *The Open zone line shown on the County's Zoning Map imposes a setback as to Lot 6 from 9.36 feet at its Northeastern corner, to 21.70 feet at its Northwestern corner, from the July 26, 2002 certified shoreline for Lot 6.*
> . . . .
> 97. The [Developer's Setback] shown on the July '83 Map, after application of the 10 feet sideyard and other applicable setbacks, resulted in a triangular buildable area on Lot 6 of only 4,203 square feet.
> . . . .
> 102. Other improved lots in the immediate neighborhood ... were subject to shoreline setbacks ranging from 80 to 35 feet.
> . . . .
> 104. ... [A]pplication of the [Developer's Setback] to Lot 6 results in a buildable area of 4,203 square feet, or only 24.7% of the lot.
> . . . .
> 113. *Due to the building constraints aforesaid, Brescia cannot make a reasonable use of his property when restricted to the 4,203 square feet triangular buildable area.*
> . . . .
> 115. The Commission's denial of the variance lacks support in the record.

(Emphases added.)

thereto. The court's order in effect found (1) the Open zone strip referred to in the SMA (U)–84–2 order is the Open zone shown on the County's Zoning Map, (2) Brescia had a right to rely on alleged representations made by Planning Department employees as to a purported setback boundary, and (3) Brescia cannot make reasonable use of his property if the Developer's Setback is imposed.[8]

The court's relevant conclusions were as follows:

> 4. *The "Open zone strip fronting the shoreline", as contained in Condition 2(b) of the SMA Decision and Order, is the Open zone as shown on the County Zoning Map* in existence at the time, as supported by the reliable, probative and substantial evidence on the whole record.
>
> 5. The Open zone as shown on the County's Zoning Map, within which structures are prohibited, is sufficient to meet and is not contrary to the objectives of the State's [CZMA] and the [SMA] laws, as supported by the reliable, probative and substantial evidence on the whole record.
> . . . .
> 7. The Commission's finding that the Planning Commission in [the order granting SMA (U)–84–2] intended that the "Open zone strip fronting the shoreline" be the [Developer's Setback] shown on the July '83 Map, instead of the Open zone shown on the County's Zoning Map and North Shore Development Plan (Update No. 1), was clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record.
>
> 8. *The Commission's reaffirming the [Developer's Setback] shown on the July '83 Map on December 11, 2001, sixteen years after the fact and after continued application and representation to the public of another setback line, was made in excess of statutory authority.*
> . . . .
> 10. The Commission's actions on December 11, 2001 in its new interpretation and application of a setback line, without any notice to and the opportunity to be heard by Brescia and other affected landowners, were made in violation of their constitutional right of due process.
> . . . .
> 25. *The record on the whole, through reliable, probative and substantial evidence, also clearly demonstrated that Brescia could not make reasonable use of Lot 6 if the [Developer's Setback] is upheld* and strict conformity therewith is required.
>
> 26. Brescia having met the standards for the granting of a variance to enable the reasonable use of Lot 6 in accordance with privileges enjoyed by other lots in the immediate vicinity, *the Commission erroneously denied the variance* in view of the reliable, probative, and substantial evidence on the whole record.

(Emphases added.)

On April 4, 2005, Appellants filed their Notice of Appeal with this court.

### III.

On appeal, Appellants argue that the court's *"entire* Findings of Fact, Conclusions of Law, Decision and Order ... is being appealed as it is wrong as a matter of law." (Emphasis in original.) Appellants argue that it was an abuse of discretion or a clearly unwarranted exercise of discretion in violation of HRS § 91–14(g)(6) (1993) [9] for the court to substitute its own judgment for that of the Commission when it reversed the Commission's decision to deny Brescia's application.

In response, Brescia argues that (1) "the [Commission's] subsequent recognition 16 years later of the [Developer's Setback] on the never adopted July '83 Map in lieu of the [County Zoning Map], was clearly erroneous in view of the reliable, probative and substantial evidence on the whole record"; (2) "the Commission cannot impose and enforce a setback line which is not shown on the final subdivision map, as was required by law"; (3) "the action of the Commission cannot be justified on the basis of enforcement of the CZMA"; (4) "the Commission's decision that the remaining buildable area allows Brescia a reasonable use of his property is without support and in error"; (5) "the refusal to amend the SMA conditions or to grant a variance for the proposed dwelling was arbitrary, capricious, and characterized by abuse of discretion"; (6) "the Commission is estopped from enforcing a totally different building prohibition than is set forth in the [SMA (U)–84–2 order]"; and (7) "Brescia had a vested right to proceed with the construction of his residence," and "the Commission's action to recognize the line on the July '83 map as the applicable setback line violated Brescia's constitutional due process rights."

### IV.

■ " 'Review of a decision made by a court upon its review of an administrative decision is a secondary appeal. The standard of review is one in which this court must determine whether the court under review was right or wrong in its decision.' " *Leslie v. Bd. of Appeals of County of Hawaii,* 109 Hawai'i 384, 391, 126 P.3d 1071, 1078 (2006) (quoting *Lanai Co., Inc. v. Land Use Comm'n,* 105 Hawai'i 296, 306–07, 97 P.3d 372, 382–83 (2004) (other citation omitted)). The standards as set forth in HRS § 91–14(g) (1993) are applied to the agency's decision. *Ka Pa'akai O Ka'aina v. Land Use Comm'n,* 94 Hawai'i 31, 40, 7 P.3d 1068, 1077 (2000). HRS § 91–14(g) provides:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

" 'Under HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6).' " *Sierra Club v. Office of Planning, State of Hawai'i,* 109 Hawai'i 411, 414, 126 P.3d 1098, 1101 (2006) (quoting *In re Hawaiian Elec. Co.,* 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996) (other citation omitted)).

■ " 'An agency's findings are not clearly erroneous and will be upheld if supported by reliable, probative and substantial

9. See *infra.*

evidence unless the reviewing court is left with a firm and definite conviction that a mistake has been made.' " *Poe v. Hawai'i Labor Relations Bd.,* 105 Hawai'i 97, 100, 94 P.3d 652, 655 (2004) (quoting *Kilauea Neighborhood Ass'n v. Land Use Comm'n,* 7 Haw. App. 227, 229–30, 751 P.2d 1031, 1034 (1988)). " '[T]he courts may freely review an agency's conclusions of law.' " *Lanai Co.,* 105 Hawai'i at 307, 97 P.3d at 383 (quoting *Dole ·Hawaii Div.-Castle & Cooke, Inc. v. Ramil,* 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990) (other citation omitted)). "Abuse is apparent when the discretion exercised clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *Kimura v. Kamalo,* 106 Hawai'i 501, 507, 107 P.3d 430, 436 (2005) (internal quotation marks and citation omitted).

## V.

■ In connection with his first argument, Brescia acknowledges that "[t]here is little question that the [SMA (U)–82–2 order] imposed a prohibition against building in the Open zone strip fronting the shoreline of the Wainiha II subdivision." Brescia argues that the "[t]he issue is whether the 'Open zone strip' was determined by (1) the clearly existing Open/Residential line on the officially adopted County's Zoning Map, or (2) the elusive [Developer's Setback] shown on the July '83 Map which was never adopted or even mentioned in the [SMA (U)–84–2 order]." We conclude that the Commission's decision in enforcing the Developer's Setback as shown on the July 1, 1983 subdivision map is supported by reliable, probative, and substantial evidence on the whole record and, thus, was not clearly erroneous. Accordingly, the court's finding no. 58 that "[t]he Open zone strip fronting the shoreline referred to in the SMA decision and Order is the Open zone shown on the County's Zoning Map" is clearly erroneous, and conclusion no. 4 which states, *inter alia,* that "[t]he 'Open zone strip fronting the shoreline,' . . . is the Open zone

as shown on the County Zoning Map" is wrong.

Brescia states, "[E]xcept for the verbiage referencing the Open strip fronting the shoreline, the [Commission in its SMA (U)– 84–2 order] did not adopt, approve, or incorporate by reference any of the maps presented in the proceedings." According to Brescia, inasmuch as the only official map which showed "any Open zoned strip along the shoreline was the County's Zoning Map, adopted by the County under ordinance No. 239," this is the only setback of which he had notice. Brescia maintains, "[M]oreover, the County's North Shore Development Plan Update (which is also the County's Zoning Map) was adopted by the [Commission] at a special meeting on September 28, 1983, only two months before the issuance of [the SMA (U)– 84–2 order]." Thus, Brescia asserts that Commission members were aware of the contents of the North Shore Development Plan Update and, given that the SMA (U)–84–2 order refers to the "Open zoned portion" in the past tense, it is apparent that the Commission was referring to the County Zoning Maps.

We first note, as previously stated, that the maps submitted by the Developer in seeking a SMA Use Permit to develop the subdivision indicated a Developer's Setback, which would impose a shoreline setback in the area that would become Lot 6 of approximately 61 to 71 feet at each makai corner. The maps and the Developer's Setback shown thereon were part of the Developer's application and the setback remained consistent throughout the Developer's submissions.

The Developer also included in his application an Environmental Assessment which stated, *inter alia,* that "[n]o structures are allowed within 40 feet of the certified shoreline and, therefore, the shoreline area will not be affected." The SMA (U)–84–2 order, in finding nos. 10 and 23, confirmed that the "Open District strip is approximately 40–75 feet wide," [10] and that "[n]o construction shall be allowed within the Open zoned portion of the property along the shoreline." Although

**10.** There is no evidence in the record that this condition in SMA (U)–84–2 was contested or

appealed after its issuance.

no reference is made to what the developer called the "Zoning District Boundary Setback Line," findings nos. 10 and 23 in the SMA (U)–84–2 order plainly refer to that setback, in effect incorporating the Developer's Setback by reference to the Open district strip.[11] It is evident, then, that SMA (U)–84–2 condition 2(b), stating in part that "[n]o part of any structure shall penetrate the Open zone strip fronting the shoreline," refers to the land seaward of the Developer's Setback. This setback line indicates an approximate 61 to 71 foot setback in the area of Lot 6. Hence, Brescia's argument that the "Open zoned portion" referred to by the Commission ·in SMA (U)–84–2 is not the 40–75 foot strip specifically described in the order as the "Open district strip," but is rather the area marked "Open" on the County Zoning Map, is not persuasive.

The approximate 9– to 22–foot shoreline setback in the area of Lot 6 indicated as "Open" on the County Zoning Map would be less than the setback established in the SMA (U)–84–2 order, and is thus inconsistent with that order. The court's finding no. 58 that "[t]he Open zone strip fronting the shoreline referred to in the SMA Decision and Order is the Open zone shown on the County's Zoning Map," then, is clearly erroneous inasmuch as the record lacks any substantial evidence to support such a finding.

### VI.

■ Brescia's second argument on appeal is that the Commission cannot impose and

enforce a setback line not shown on the final subdivision map, as required by law. For reasons stated both *supra* and *infra,* we conclude as clearly erroneous the court's finding no. 57 that "[t]he imposition of the [Developer's Setback] on the Final Subdivision Map, under the guise of correcting the final subdivision map, exceeds the authority granted to the Commission under Section 9–3.8(c)(5) of the Kauai County Code, for it reflected a change in interpretation 16 years after the fact and not an error in dimension, discrepancy or oversight."[12]

■ As mentioned above, Section 9–3.8 of the Kaua'i County Code requires that setback lines be indicated on the final subdivision map, however, no setback lines, including the Developer's Setback, were indicated on the final subdivision map. Pursuant to HRS § 205A–28 (2001), "[n]o development shall be allowed in any county within the [SMA] without obtaining a permit in accordance with this part." Thus, within a SMA, development is controlled by a SMA permit. *See Mahuiki,* 65 Haw. at 519 n. 14, 654 P.2d at 883 n. 14 (stating that "[p]ermits required under this act supersede all others, including any permits required from state agencies such as the Land Use Commission in conservation and agricultural districts along the coast, so that the 1975 shoreline protection legislation for the first time supersedes state controls in an important area of environmental concern" (quoting D. Mandelker, *Environmental and Land Controls Legislation*

---

11. Assuming that the Environmental Assessment or Planning Director's reference to the Open Zone in his Evaluation referenced the "O" zone on the County Zoning maps, the maps being evaluated illustrate the "Zoning District Boundary Setback Line" (Developer's Setback) the Developer had represented to the Commission. As to the Northshore Development Plan, the Commission noted in its finding no. 12 that the plan was "still subject to" further approvals. In any event the Commission's finding no. 10 stated that the open district strip was 40–75 feet.

12. As previously noted, Section 9–3.8(c)(5) of the Kaua'i County Code, entitled "Errors and Discrepancies," states as follows:

The approval of the final subdivision map by the Planning Commission shall not relieve the applicant of the responsibility for any error in

the dimensions or other discrepancies or oversights. Errors, discrepancies, or oversights shall be revised or corrected, upon request to the satisfaction of the Planning Commission.

Brescia suggests that the omission of the Developer's Setback on the final subdivision map did not constitute an error in dimension or oversight of the type intended for correction by Section 9–3.8(c)(5) of the Kaua'i County Code. As noted, the Commission, in conclusion no. 15 of its 2003 order, stated that "pursuant to Section 9–3.8(d)(5) of the Kaua'i County Code, 1987, as amended, [the Commission] has the authority with respect to the revision or correction of approved final subdivision maps." Inasmuch as we uphold the Commission's decision on other grounds, we need not reach the question of whether the discrepancy in this case was of the type encompassed in Section 9–3.8(c)(5) of the Kaua'i County Code.

317–18 (1978))). Irrespective of the fact that the final subdivision map did not indicate any setback lines as is required by County ordinance, the Developer's Setback, as required by SMA (U)–84–2, must be adhered to. Accordingly, Brescia's second argument is unavailing.

## VII.

█ Brescia's third argument on appeal is that the action of the Commission "cannot be justified on the basis of enforcement of the [CZMA]." Brescia contends that the Commission "ignor[ed] the plain language of [the SMA (U)–84–2 order]" and that "[t]he issue in this appeal is whether the [court] was correct in finding and concluding that the Commission's actions under the circumstances were inconsistent with [the SMA (U)–84–2 order]." Inasmuch as we conclude, as stated *supra*, that the Commission's use of the Developer's Setback was consistent with the plain language in the SMA (U)–84–2 order, as also reflected in Brescia's deed, the Commission's imposition of the Developer's Setback was justified. Additionally, as Brescia recognizes, the record clearly shows that as to the SMA (U)–84–2 order, the "Commission duly considered, addressed and upheld the policies and objectives of the CZMA, as well as its [SMA] requirements[.]" Thus, the court's conclusion no. 7 that "[t]he Commission's finding that the Planning Commission in SMA (U)–84–2 in 1984 intended that the 'Open zone strip fronting the shoreline' be the [Developer's Setback] shown on the July '83 Map, instead of the Open zone shown on the County's Zoning Map ..., was clearly erroneous" is wrong as a matter of law.

Nonetheless, Brescia further contends that "[t]he decision by the Commission to reject Brescia's proposals and to impose the [Developer's Setback] on Lot 6 with its 61 ½– to 71–feet setback was in *clear excess* of the requirements and objectives of the CZMA ... and the [Kaua'i Rules]." (Emphasis added.) Brescia does not cite any specific provision of the CZMA or the Kaua'i Rules in connection with this assertion. It is observed, however, that HRS § 205–32 (Supp.1970) and Section

5 of the Kaua'i Rules both pertain to the establishment of shoreline setbacks. HRS § 205–32 stated in pertinent part that "[t]he commission shall *establish* setbacks along shorelines of not less than twenty feet and not more than forty feet inland[.]" (Emphasis added.) Section 5 of the Kaua'i Rules states in relevant part that "[s]horeline setback lines are *established* throughout the County of Kauai at 40 feet inland ..., except that such shoreline setback lines shall be 20 feet inland ... [w]here the buildable area of the parcel is reduced to less than 50 percent ... after applying the 40 foot shoreline setback line and all State and County requirements[.]" (Emphasis added.) "Establish" is defined as "[t]o make or form; to bring about or into existence[.]" *Black's Law Dictionary* 586 (8th ed.2004).

█ On the plain language of the statute and the rule, the establishment of these setbacks does not prohibit a developer from proposing a greater shoreline setback on a development than those contained in HRS § 205–32 or Section 5 of the Kaua'i Rules in an application for a SMA use permit. Likewise, the CZMA and the Kaua'i Rules do not prohibit the Commission from accepting such a proposal in approving a SMA use permit. Of course, generally, a setback is nothing more than "[t]he *minimum* amount of space required between a lot line and a building line." *Black's Law Dictionary* at 1404 (emphasis added).

In that regard, as previously mentioned, this is not the first time in which this court has considered the Wainiha Subdivision II. *See supra.* In *Mahiuiki*, this court overturned the Commission's issuance of a SMA use permit after the Commission failed to comply with the directives of the CZMA, which required it "to make a specific finding that the proposed development would 'not have any substantial adverse environmental or ecological effect, except as such adverse effect is clearly outweighed by public health and safety' before approving the SMA use permit application." 65 Haw. at 516, 654 P.2d at 881 (quoting HRS § 205A–26(2)(A) (1976)) [13]. Thus, this court vacated the cir-

**13.** The current version of HRS § 205A–26(2)(A)

(1976), HRS § 205A–26(2)(A) (2001) states:

cuit court's order of dismissal and summary judgment in favor of the Developer, and remanded the case for proceedings consistent with its opinion. *Id.* at 519, 654 P.2d at 883.

Subsequently, as Brescia states, the SMA (U)–84–2 proceeding "was a re-application by the [Developer] for the same development following the reversal and remand in *Mahuiki*[.]" To reiterate, the Developer's first proposal was for a 22–lot subdivision. With his application, the Developer included a proposed preliminary subdivision plan map, which designated the Developer's Setback. After facing community opposition to the proposed development, the Developer simultaneously submitted a second proposal for a 20 lot subdivision, and a third proposal for a 19 lot subdivision. Like the first proposal, both the second and third proposals included a map indicating the Developer's Setback. After continued opposition, the Developer submitted a fourth proposal accompanied by a map again reflecting the Developer's Setback. On December 15, 1983, the Commission approved SMA (U)–84–2, which contains the Developer's Setback. As Brescia relates, "there was no appeal from the granting of the [SMA (U)–84–2.]" In that regard, pursuant to HRS § 205A–29 (2001), "[a]ction on the special management permit shall be final unless otherwise mandated by court order."

Because plainly the CZMA and the Kaua'i Rules did not prohibit the Developer from proposing the Developer's Setback, and the Commission from accepting that setback in approving SMA (U)–84–2, the restrictive covenant containing the Developer's Setback in the CC & Rs and Brescia's deed are valid. Similarly, in *McDonald v. Emporia–Lyon County Joint Bd. of Zoning Appeals,* 10 Kan.App.2d 235, 697 P.2d 69, 70–72 (1985), the Court of Appeals of Kansas held that the grant of a setback variance by the proper municipal authorities did not have any effect upon a setback established in a restrictive

covenant and, thus, affirmed the trial court's grant of summary judgment to the plaintiffs because of a violation of a restrictive covenant setback provision. In so holding, the *McDonald* court observed that "it is generally recognized that ... '[r]estrictive covenants do not supersede or in any way affect the requirements of an already existing zoning ordinance, and conversely, a zoning ordinance cannot destroy, impair, abrogate, or enlarge the force and effect of an existing restrictive covenant.'" *Id.* at 71 (citation omitted). Accordingly, "'[z]oning ordinances, if less restrictive, do not diminish the legal effect of private restrictive covenants.'" *Id.* (citation omitted).

As Brescia recounts, he and his wife acquired Lot 6 by warranty deed, which referenced the CC & Rs. As indicated previously, the CC & Rs plainly state that "as a condition to final subdivision approval for the Property by the [Commission], certain restrictive covenants were imposed upon the Property, which restrictive covenants are stated in Schedule 'B' attached hereto and made a part hereof." The reason for such covenants as the CC & Rs was the "desire[ ] to enhance and protect the value, desirability and attractiveness of the Property." To reiterate, the CC & Rs also state that:

> *[Stallone] for the mutual benefit and protection of all Owners (as hereinafter defined), hereby declares that the Property shall be held, leased, encumbered, conveyed, sold, used, occupied and improved, subject to and with the benefit and protection of the limitations, restrictions, covenants and conditions set forth in this Declaration, all of which are established and declared and agreed to be for the purpose of enhancing and protecting the value, desirability and attractiveness of the Property. These limitations, restrictions, covenants and conditions shall run with the Property and shall inure to the benefit of and be binding on all parties having or*

(2) No development shall be approved unless the authority has first found:
 (A) That the development will not have any substantial adverse environmental or ecological effect, except as such adverse effect is minimized to the extent practicable and clearly outweighed by public health, safety, or compelling public in-

terests. Such adverse effects shall include, but not be limited to, the potential cumulative impact of individual developments, each one of which taken in itself might not have a substantial adverse effect, and the elimination of planning options[.]

who acquire any right, title or interest in the Property or any part thereof, their heirs, personal representatives, successors and assigns.

(Emphases added.) As Brescia sets forth, "Schedule 'B' [is] a restatement of the conditions of approval in the [SMA (U)–84–2,]" which includes the shoreline building restriction that "[n]o part of any structure shall penetrate the Open Zone strip fronting the shoreline." As discussed *supra*, the Open Zone strip refers to the land seaward of the Developer's Setback. In sum, contrary to Brescia's suggestion, the CZMA and the Kaua'i Rules did not prohibit the Developer from proposing the Developer's Setback in his application for SMA (U)–84–2, and likewise the Commission was not prohibited from accepting the Developer's Setback in approving a SMA (U)–84–2. Accordingly, Brescia's third argument is not cogent.

## VIII.

█ In connection with Brescia's fourth argument regarding reasonable use, as Appellants point out, the "requirement prohibiting any building in the Open zone as well as the other conditions of development were known or should have been known to [Brescia] as they were incorporated into his deed, and he would not obtain final approval for the building location on his lot until the 'time of building and zoning permit application.'" As recounted previously, these restrictions were incorporated into Brescia's deed as restrictive covenants.

█ This court has "long held that where a deed makes a specific reference to a restrictive covenant, the grantee is on notice that his interest is subject to the terms of that restrictive covenant." *Lee v. Puamana Cmty. Ass'n,* 109 Hawai'i 561, 568, 128 P.3d 874, 881 (2006) (citing *Pelosi v. Wailea Ranch Estates,* 91 Hawai'i 478, 489, 985 P.2d 1045, 1056 (1999) ("The individual defendants in the present matter *had* constructive notice, by virtue of their deeds, of the [ ] covenants." (Emphasis and brackets in original.)); *Rawlins v. Izumo Taisha Kyo Mission of Hawaii,* 36 Haw. 721, 726 (1944) (stating that equity will enforce a contract "containing restrictive covenants which cre-

ate equitable easements, such as restrictive covenants in a deed or lease limiting the use of the land in a particular manner or prescribing a particular use which creates equitable servitudes")). " '[I]t is a well-settled rule that in construing deeds and instruments containing restrictions and prohibitions as to the use of property conveyed, all doubts should be resolved in favor of the free use thereof for lawful purposes in the hands of the owners of the fee.' " *Hiner v. Hoffman,* 90 Hawai'i 188, 195, 977 P.2d 878, 885 (1999) (quoting *In re Taxes of Johnson,* 44 Haw. 519, 538, 356 P.2d 1028, 1038 (1960) (citation and internal quotation marks omitted)) (brackets omitted). Also, "such 'free and unrestricted use of property' is favored only to the extent of applicable State land use and County zoning regulations.' " *Id.* at 195–96, 977 P.2d at 885–86 (quoting *Collins v. Goetsch,* 59 Haw. 481, 485 n. 2, 583 P.2d 353, 357 n. 2 (1978)).

Brescia asserts that the Developer's Setback imposed by the Commission, which as noted above results in a shoreline setback of roughly 61 feet and 71 feet at each makai corner of Lot 6, denied Brescia reasonable use of his property and is "without support and in error." In that regard, to repeat, Brescia requested an amendment to SMA (U)–84–2 on the basis that such an amendment was needed in order to allow reasonable use of his property:

*Special Management Area Use Permit.* Although a Special Management Area Use Permit has already been issued for the subdivision, i.e., SMA (U) 84–2[ ], an amendment to the permit is necessary to deviate from the building setback line deemed by the Planning Department to be applicable to the lot of approximately 70 feet inland of the certified shoreline. The proposed residence is 31 feet inland of the certified shoreline at its nearest point, and *the setback line (if determined to be 70 feet) must be amended to accommodate the proposed residence to allow reasonable use of the property by [Brescia].*

(Emphasis added.)

As stated previously, the Commission denied Brescia's request and concluded as follows:

18. *Prohibiting buildings within the area fronting the [Developer's Setback]* identified in the Findings of Fact, Conclusions of Law, Decision and Order, for SMA (U)–84–2, dated December 15, 1983, and on the proposed subdivision map dated July 1, 1983 submitted with the Application for SMA (U)–84–2 as it applies to Lot 6, *provides [Brescia] with reasonable use of his property.*

19. Reasonable use it not necessarily the use most desired by the owner of the property, and [Brescia's] *compliance with SMA (U)–84–2 allows for the construction of a substantial house on the property without [Brescia] being denied reasonable use of the property.*

(Emphases added.)

According to Brescia's September 3, 2002 application, as well as his January 28, 2003 written testimony to the Commission, a setback of approximately 63 feet as shown on the July 1, 1983 map would allow for a triangular-shaped buildable area of approximately 4,974 square feet. As stated, Brescia later revised this estimate, and in his May 6, 2003 Opening Brief to the Commission related that the buildable area on which to construct a single family residence would be 4,203 square feet. Brescia asserts that 4,203 square feet of buildable area equates to 24.7% of the Lot 6 area. As indicated previously, within this buildable area—whichever of Brescia's estimates is used—he must construct a residence of at least 2,500 square feet, excluding garage, lanais, a required turnaround area, and septic system. Brescia's architect, in apparent full recognition of these requirements, stated at the January 28, 2003 public hearing, "I don't want to say its totally unbuildable."

■ It is well established that "mere diminution of market value or interference with the property owner's personal plans and desires relative to his property is insufficient to invalidate a zoning ordinance or to entitle him to a variance[.]" *City of Eastlake v. Forest City Enters. Inc.,* 426 U.S. 668, 674 n. 8, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976) (internal quotation marks, citations, and brackets omitted). In *Korean Buddhist Dae Won Sa Temple of Hawai'i v. Sullivan,* 87 Hawai'i 217, 235, 953 P.2d 1315, 1333 (1998), this court found that an applicant for a variance "failed to establish that it could make *no reasonable use* of the land or its [h]all without building the [h]all to a height of seventy-five feet[,]" given that the record indicated the applicant initially submitted plans reflecting a construction design for the hall of sixty-six feet in height. (Emphasis added.) This court stated that reasonable use of the land, in this case within the meaning of the City Charter, is "not necessarily the use most desired by the owner." *Id.* at 234, 953 P.2d at 1332 (citation omitted).

Inasmuch as the Commission in finding no. 15 found that according to Brescia's own application letter a shoreline setback of approximately 63 feet would allow the applicant a triangular-shaped building area of approximately 4,974 square feet, and whereas Brescia's own architect testified that utilizing the Developer's Setback did not necessarily make the lot unbuildable, the Commission could rationally conclude that Brescia did not establish that he could not make reasonable use of the property based on the Developer's Setback. Thus, it was error for the court to hold in conclusion no. 25 that "[t]he record on the whole, through reliable, probative and substantial evidence, also clearly demonstrated that Brescia could not make reasonable use of Lot 6 if the [Developer's Setback] is upheld and strict conformity therewith is required." Because substantial evidence exists in the record to indicate that the setback imposed by the Commission will permit Brescia to construct a residence of at least 2,500 square feet of living area, the Commission could have rationally determined that Brescia retained the reasonable use of his property.

## IX.

■ Brescia's fifth argument on appeal is that the Commission's refusal to amend the SMA conditions or to grant a variance for Brescia's proposed dwelling, which would approach within 31 feet of the shoreline, was arbitrary, capricious, and characterized by abuse of discretion. In HRS § 205A–46(a)(8) entitled "Variances," the legislature provided that the counties may grant variances based on hardship. As noted *supra,* the Commis-

sion has not defined in its Kaua'i Rules what constitutes "hardship" for the purposes of evaluating shoreline setback variances. In the absence of such a definition, Brescia and the Commission appear to have proceeded on the basis of evaluating whether a setback variance was necessary in order that Brescia retain "reasonable use" of his property.[14]

We observe initially that, as mentioned *supra*, Kaua'i Rules, Section 12(b), states that the application for a variance *shall* be accompanied by "*accurate written statements to substantiate that ... hardship will be caused.*"[15] (Emphases added.) In support and justification of his request, Brescia asserts that "[o]ther improved lots in the immediate neighborhood range in size from 27,-674 to 13,671 square feet" and that "[t]hese regularly shaped lots were subject to shoreline setbacks ranging from 80 to 35 feet of the certified shoreline"; his 3,300 square foot proposed residence would not be the largest house in the subdivision; and "92% of the proposed residence would be more than 40 feet from the shoreline."

To reiterate, the Commission denied Brescia's request to amend SMA (U)–84–2 or grant a variance based on its findings and conclusions. As discussed, the Commission could have properly determined that, even with the imposition of the Developer's Set-back, Brescia is not deprived of reasonable use of his property. *See supra.* Furthermore, as Brescia explains, the SMA (U)–84–2 proceeding in 1983 was a "re-application by the [Developer] for the same development following the reversal and remand in *Mahuiki*[.]" As Brescia indicates, following this court's decision in *Mahuiki*, the Commission "could not have been but painfully aware of the importance given to the CZMA by [this] court in *Mahuiki*" during the SMA (U)–84–2 proceeding. Thus, as Brescia recounts, "[t]he record accordingly clearly shows that the [Commission] duly considered, addressed and upheld the policies and objectives of the CZMA, as well as its [SMA] requirements" in SMA (U)–84–2.

Significantly, as Brescia relates, "there was no appeal from the granting of [SMA (U)–84–2]." Again, pursuant to HRS § 205A–29, "[a]ction on the special management permit shall be final unless otherwise mandated by court order." In that regard, we have recently observed that "the legislature expressly granted to the [Commission] the authority to carry out the objectives, policies and procedures of the CZMA's SMAs." *Morgan v. Planning Dept., County of Kauai*, 104 Hawai'i 173, 184, 86 P.3d 982, 993 (2004) (citing HRS § 205A–27 (2001)). Thus, "[i]n order to carry out this express

---

14. *See supra* note 6 and accompanying text.

15. Whereas the fact that Kaua'i County has not adopted a definition of "hardship" for the purposes of evaluating requests for shoreline setback variances is not raised on appeal, the impact of this omission need not be considered.

Other counties have included in their criteria for establishing "hardship" for purposes of granting a shoreline setback variance the factor of whether a variance is necessary to provide the applicant reasonable use of his or her property. For example, the Revised Ordinances of Honolulu, Chapter 23 "Shoreline Setbacks," Section 23–1.8, entitled "Criteria for granting a variance," states in relevant part:

(3) Hardship Standard.
 (A) A structure or activity *may* be granted a variance upon grounds of hardship *if*:
 (i) The applicant would be *deprived of reasonable use* of the land if required to comply fully with the shoreline setback ordinance and the shoreline setback rules;
 (ii) The applicant's proposal is due to unique circumstances and does not draw into question the reasonableness

of this chapter and the shoreline setback rules; and
 (iii) The proposal is the practicable alternative which *best conforms to the purpose of this chapter* and the shoreline setback rules.

(Emphases added.) Also, County of Hawai'i Planning Commission, Rules of Practice and Procedure, Section 8–10 entitled, "Criteria for Approval of a Variance," states:

(3) Hardship Standard
 (A) A structure or activity *may* be granted a variance upon grounds of hardship *only if*:
 (i) The applicant would be *deprived of reasonable use* of the land if required to comply fully with this rule; and
 (ii) The request is due to unique circumstances and does not draw into question the reasonableness of this rule; and
 (iii) The request is *the practicable alternative which best conforms to the purpose of this rule.*

(Emphases added.)

responsibility, the [Commission] must have authority to enforce the conditions of a SMA Use permit." *Id.*

Moreover, as reflected in the Commission's findings, the application for SMA (U)–84–2 included the preliminary subdivision map which identified the Developer's Setback relied upon by the Commission in approving SMA (U)–84–2. The approval of SMA (U)–84–2 was subject to conditions, including that "[b]uilding locations ... shall be subject to [Commission] review and approval at the time of building and zoning permit application[,]" "[n]o part of any structure shall penetrate the Open zone strip fronting the shoreline[,]" "[t]he setback from Alealea Road and Alamo'o Road shall be a minimum of 20 feet[,]" "[a]ll other front yard setbacks shall be 15 feet[,]" and "[t]he side yard setbacks shall be a minimum of 10 feet." The approval of SMA (U)–84–2 required that the conditions of the permit "shall be established as restrictive covenants within each deed at the time of subdivision." Additionally, the requirements and conditions of SMA (U)–84–2 were in fact included in the CC & Rs recorded on February 20, 1992. The recorded CC & Rs were incorporated into Brescia's deed. Brescia then clearly had notice of the requirements and conditions of SMA (U)–84–2 when he acquired his property.

 Hence, inasmuch as the objectives and policies of the CZMA are "paramount in any determination involving the use of land in a special management area[,]" *Mahuiki,* 65 Haw. at 519, 654 P.2d at 882–83 (citations omitted), the Commission upheld these objectives and policies in issuing SMA (U)–84–2, and the requirements and conditions of SMA (U)–84–2 were incorporated in Brescia's deed as restrictive covenants, the Commission had rational grounds for denying Brescia's request to amend SMA (U)–84–2, or for a variance. Under the circumstances of this case, the Commission did not "clearly exceed[ ] the bounds of reason or disregard[ ] rules or principles of law or practice to the substantial detriment of a party litigant." *Kimura,* 106 Hawai'i at 507, 107 P.3d at 436 (internal quotation marks and citations omitted).

Consequently, the court's finding no. 115 that "[t]he Commission's denial of the variance request [to build out to within 31 feet of the shoreline] lacks support in the record" is clearly erroneous, especially in light of the fact that the court itself acknowledged in finding no. 102 that "[o]ther improved lots in the immediate neighborhood were subject to shoreline setbacks ranging from 80 to 35 feet." Finally, in this regard, the court's conclusion no. 26 which states, in part, that "the Commission erroneously denied the variance in view of the reliable, probative, and substantial evidence on the whole record," is wrong as a matter of law.

## X.

 Brescia's sixth argument on appeal is that the Commission is estopped from enforcing a "totally different building prohibition than is set forth in the [SMA(U)–84–2 order]." More specifically, Brescia asserts that the Commission should be bound by the 20–foot setback he claims the Planning Department represented to be applicable. We hold that the estoppel doctrine is not applicable.

 In the context of this case, equitable estoppel is

> based on a change of position on the part of a land developer by substantial expenditure of money in connection with his project in reliance, not solely on existing zoning laws or on good faith expectancy that his development will be permitted, but *on official assurance on which he has a right to rely* that his project has met zoning requirements, that necessary approvals will be forthcoming in due course, *and he may safely proceed with the project.*

*Life of the Land Inc., v. City Council of the City & County of Honolulu,* 61 Haw. 390, 453, 606 P.2d 866, 902 (1980) (emphases added). Estoppel "cannot be applied to actions for which the *agency or agent* of the government has no authority." *Turner v. Chandler,* 87 Hawai'i 330, 334, 955 P.2d 1062, 1066 (App.1998) (quoting *Filipo v. Chang,* 62 Haw. 626, 634, 618 P.2d 295, 300 (1980) (other citation omitted)) (emphasis added). It is well established that zoning which terminates

inchoate rights to develop land is a legitimate exercise of the police power. *See County of Kauai v. Pac. Standard Life Ins. Co.*, 65 Haw. 318, 336–37, 653 P.2d 766, 779 (1982) (citation omitted). "Zoning estoppel is not intended to protect speculative business risks. Thus, an expenditure made in compliance with underlying zoning but before final discretionary action will be disregarded for estoppel purposes." *Id.* at 332, 653 P.2d at 777 (citing *Life of the Land Inc.*, 61 Haw. at 455, 606 P.2d at 903).

Brescia maintains that "for the past 16 years, the County had understood and represented to the public that the applicable setback was 20 feet." As support for this contention, Brescia submitted a letter written to a neighboring property owner by Deputy Planning Director Sheilah Miyake, in which the shoreline setback for the neighbor's property was confirmed to be 20 feet according to the Kaua'i Rules. Brescia states that "[a]t the time of and prior to acquiring Lot 6 for more than $900,000, Brescia and his agents inquired and were informed by members of the Kaua'i Planning Department that the setback for Lot 6 was 20 feet inland of the certified shoreline." According to the Commission, Brescia submitted an affidavit "which stated he 'was informed by Kauai County Officials', whom he did not name, [that] the shoreline setback on Lot 6 was 20 feet inland of the certified shoreline."

But as this court noted in *Kepo'o v. Kane*, 106 Hawai'i 270, 295, 103 P.3d 939, 964 (2005), " '[a]gents of the government must act within the bounds of their authority; and one who deals with them assumes the risk that they are so acting.' " (Quoting *Sangre de Cristo Dev. Co., Inc. v. United States*, 932 F.2d 891, 894 (10th Cir.1991).). The authority to establish setback lines within the SMA, as stated in Brescia's deed, rests with the Commission. It is well accepted that a public employee not vested with decision making authority may not bind the state in its exercise of the police power. *See Godbold v. Manibog*, 36 Haw. 206 (1942) (holding that a state cannot be estopped by

the unauthorized acts or representations of its officers).

More importantly, the estoppel argument is unavailing given the fact that Schedule "B," Condition 8 in Brescia's CC & Rs states, *inter alia*, that *"[i]ncreased setbacks shall be required by the Planning Commission at time of zoning and building permit review* if the design of a residence warrants a greater setback." (Emphasis added.) Thus, Brescia was on notice that the Commission retained the discretionary authority to impose a greater setback.

Nonetheless, the court in finding no. 77 found that "Brescia had the right to rely on the representations of the County Planning Department as to the applicable setbacks for the subdivision." This is not a finding of fact, but is rather a conclusion of law. This court "reviews conclusions of law *de novo*, under the right or wrong standard." *T's Enters. Inc. v. Del Rosario*, 111 Hawai'i 484, 489, 143 P.3d 23, 28 (2006) (citation omitted). Because the authority to establish setback lines within the SMA, as stated in Brescia's deed, rests with the Commission, the court's conclusion that Brescia had a right to rely on the representations, if any, of the Planning Department as to the setback, is wrong. Hence, Brescia's estoppel argument must necessarily fail.

### XI.

Brescia's final argument on appeal is that he had a vested right to proceed with the construction of his residence, and that the Commission's recognition of the line on the July 1983 map as the applicable setback line violated Brescia's constitutional due process rights. We conclude that Brescia was not vested with a property interest sufficient to implicate due process protection, but in any event, he was afforded due process in this case.

Both the federal and state Due Process Clauses include protection from deprivation of property without due process of law. *See* U.S. Const. amend. XIV, § 1;[16]

---

16. The Fourteenth Amendment to the United States Constitution states in part that:

No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any

Haw. Const. art. I, § 5.[17] These guarantees apply when a constitutionally protected property interest is at stake. *See Bd. of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Sandy Beach Def. Fund v. City Council of City & County of Honolulu,* 70 Haw. 361, 376, 773 P.2d 250, 260 (1989). A property interest protected by the due process clause "stem[s] from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. A property interest will be seen to exist "if discretion is limited by the procedures in question, that is, whether the procedures, if followed, require a particular outcome." *Crown Point I, LLC v. Intermountain Rural Elec. Ass'n,* 319 F.3d 1211, 1217 (10th Cir.2003) (citing *Hyde Park Co. v. Santa Fe City Council,* 226 F.3d 1207, 1210 (10th Cir.2000)). *See also Jacobs v. City of Lawrence Kansas,* 927 F.2d 1111, 1116 (10th Cir.1991)

■ Brescia contends that when the Commission applied the more restrictive setback line reflected on the July 1, 1983 map on neighboring Lot 9 at a hearing on December 11, 2001, Brescia's due process rights were violated because his parcel was likely to be subject to the same July 1983 map setback line but he was not given notice of that hearing or an opportunity to be heard. As this court has stated, "these interests—property interests—may take many forms." *Int'l Bhd. of Painters & Allied Trades v. Befitel,* 104 Hawai'i 275, 283, 88 P.3d 647, 655 (2004) (internal quotation marks and citation omitted). "But, the range of interests protected by procedural due process is not infinite." *Id.* (internal quotation marks and citation omitted). Recounted earlier, *see supra,* SMA (U)–84–2 was issued under HRS chapter 205A and a restrictive covenant in Brescia's deed stated that "[i]ncreased setbacks *shall* be required ... if the design of a

residence warrants a greater setback." Inasmuch as Brescia's deed related that the Commission retained authority to amend the setback at the time of building permit review, Brescia was not vested with a property interest in building a particular structure.

A similar procedural due process claim in relation to a land use decision was considered in *Clark v. City of Hermosa Beach,* 48 Cal. App.4th 1152, 56 Cal.Rptr.2d 223 (1996). *Clark* held that, even though the landowner had received a conditional use permit to build a two-unit condominium, the planning commission still retained the discretion to "impose standards above the minimums designated by the zoning ordinance to improve the quality of development and to mitigate any environmental impacts." *Id.* at 241 (internal quotation marks, citation, and emphasis omitted). In finding no legitimate "claim of entitlement to a structure having any particular dimensions," that court explained as follows:

> The Clarks [ (landowners) ] do not (and cannot) claim that the City has infringed their interest in constructing a home per se. The City did not bar the Clarks from building their condominium project altogether; it denied their application without prejudice to submitting a revised plan reflecting the Council's concerns about height, lot coverage, and usable open space. Thus, the interest at issue is not that of a landowner to construct a roof over his head; rather, it is the Clarks' interest in building a structure having the specific dimensions they find desirable.

*Id.*

Hence, in the instant case, irrespective of the actions taken by the Commission at the earlier hearing relating to the neighbor's property, Brescia was not vested with a sufficient property interest to invoke a due process violation. He was on notice that the triangular-shaped parcel he was purchasing, located in the State's restricted SMA, was a "visually sensitive [parcel] in relation to its

State deprive any person of life, liberty, or property, without due process of law[.]

**17.** Article I, section 5 of the Hawai'i Constitution, entitled "Due Process and Equal Protection," provides that:

No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry.

scenic location on [Kauai's] North Shore," and from the CC & Rs in his deed, that "increased setbacks [could] be required by the Planning Commission at [the] time of zoning and building permit review[.]" Here, as in *Clark,* Brescia cannot claim an entitlement to situate his residence in any particular location, or claim an entitlement to a particular sized residence. As in *Clark,* Brescia is not being denied the right to build a home; rather, the interest must be classified as "an interest in building a structure having the specific dimensions" which Brescia finds desirable. *Id.* The discretion left in the Commission to increase the setback defeats any expectation that Brescia's application must be approved as submitted.

Brescia cites *Ridenour v. Jessamine County Fiscal Ct.,* 842 S.W.2d 532 (Ky.Ct. App.1992), for his claim that he was deprived of a property interest without due process of law. *Ridenour,* however, is distinguishable. In *Ridenour,* after conducting a full public hearing, a planning commission issued findings and a recommendation for approval of the applicant's requested zoning change. *Id.* at 534. A secondary government body with final decision-making authority conducted a review of the planning commission's decision, and was to confine itself to the record presented to the commission. *Id.* The secondary body, however, did not in fact confine itself to the planning commission record-and, further, did not inform the applicant of the meeting at which his request would be taken up. *Id.* That court held that, "[b]ecause the [secondary government body] elected to review the recommendation of the planning commission solely on the record of [the commission]," it was improper to consider matters outside the record. *Id.* at 535. Unlike in *Ridenour,* in this case the Commission was not conducting a secondary review, and was not required to confine its deliberations to any previously established record. Further, unlike in *Ridenour,* Brescia was given notice of the Commission meeting at which his zoning request would be taken up, and a full opportunity to be heard.

Brescia's reliance on *Medeiros v. Hawaii County Planning Comm'n,* 8 Haw.App. 183, 797 P.2d 59 (1990), is unpersuasive. In *Me-deiros,* the appellants owned property directly abutting land on which the county planning commission approved the drilling of 4,000–feet deep holes in the geothermal resource subzone. *Id.* at 190, 797 P.2d at 63. Appellants challenged the issuance of the permit on due process grounds. *Id.* at 193, 797 P.2d at 65. In finding no due process violation, the Intermediate Court of Appeals noted that whether appellants were vested with a property interest sufficient to trigger protection was arguable, and indeed did not reach this question. *Id.* at 194–95, 797 P.2d at 65.

Brescia proffers that the Commission's imposition of the Developer's Setback on the neighboring property "was a *fait accompli* to Brescia's prejudice and in violation of his rights." This contention is not meritorious. Brescia was given a full public hearing before the Commission made its ruling on Lot 6. At the public hearing Brescia was able to present testimony to support his request for a variance. The Commission, along with Brescia, Planning Department staff, and members of the public, conducted a site inspection of the property. It is manifest that the Commission did receive evidence concerning Brescia's request for a variance. The record supports, for the reasons stated in this decision, that the Commission was obliged to follow CZMA policies and its construction of SMA (U)–84–2 which established setbacks in the subdivision at approximately 40 to 75 feet, was supported by reliable, probative, and substantial evidence in the record. While the variance sought was ultimately denied, Brescia nonetheless received the due process to which he was entitled. Thus, the court's conclusion no. 10 that "[t]he Commission's actions on December 11, 2001 in its new interpretation and application of a setback line, without any notice to and the opportunity to be heard by Brescia and other affected landowners, were made in violation of their constitutional right of due process," was wrong as a matter of law.

## XII.

For the foregoing reasons, we vacate the court's March 4, 2005 judgment, and remand this case to the court with instructions to

enter judgment thereon affirming the Commission's September 9, 2003 order.

Concurring Opinion by LEVINSON, J., with whom MOON, C.J., joins.

I am not as comfortable as the majority with the Commission's conflation of the areas makai of the Developer's Setback with the so-called "Open zone[(d)] portion" or "strip." The majority considers "plain[]" and "evident" the correspondence between the oceanfront regions circumscribed on the Developer's maps and the "Open zoned portion" or "Open zone strip." Majority opinion at 492–93, 168 P.3d at 944–45. To the contrary, sections 8–2.2 and .3(a) of Kaua'i County's Revised Code of Ordinances (1976 & Supp.1978) unambiguously require that the boundaries of an "Open District" correspond to those on the formal "Zoning Map" and may be changed only "by ordinance." Nevertheless, I realize that a "zone" and a "district" are not necessarily synonymous and, with regard to this and the other ambiguities in the SMA (U)–84–2 order, I would defer to the technical expertise of the Commission, *see, e.g., In re Water Use, Well Constr., & Pump Install'n Permit Apps.,* 103 Hawai'i 401, 421, 83 P.3d 664, 684 (2004), which decided that the Developer's Setback and the "open zone" boundary could be, and were, one and the same.

Inasmuch as I ultimately agree with the majority that the Commission did not clearly err by concluding (1) that the SMA (U)–84–2 order incorporated the Developer's Setback and (2) that Brescia was on notice thereof, I concur in the court's judgment.